[No. A115491. First Dist., Div. Two. Apr. 23, 2008.]

STATE BUILDING AND CONSTRUCTION TRADES COUNCIL OF CALIFORNIA, Plaintiff and Respondent, v.
JOHN C. DUNCAN, as Director, etc., et al., Defendants and Appellants; SOUTHERN CALIFORNIA HOUSING DEVELOPMENT CORPORATION, Real Party in Interest and Appellant.

[No. A115663. First Dist., Div. Two. Apr. 23, 2008.]

STATE BUILDING AND CONSTRUCTION TRADES COUNCIL OF CALIFORNIA, Plaintiff and Respondent, v.
JOHN C. DUNCAN, as Director, etc., et al., Defendants and Appellants; SOUTHERN CALIFORNIA HOUSING DEVELOPMENT CORPORATION, Real Party in Interest and Respondent.

290

292

## Counsel

Vanessa L. Holton, Douglas P. Elliot and Anthony Mischel for Defendants and Apellants.

Altshuler Berzon, Stephen P. Berzon, Scott A. Kronland and Rebekah Evenson for Plaintiff and Respondent.

Cox, Castle & Nicholson, John S. Miller, Jr., and Dwayne P. McKenzie for the California Building Industry for Amicus Curiae on behalf of Plaintiff and Respondent.

Edmund G. Brown, Jr., Attorney General, Stacy Boulware Eurie and Christopher E. Krueger, Assistant Attorneys General, and Erin V. Peth, Deputy Attorney General, for State Treasurer Bill Lockyer as Amicus Curiae on behalf of Plaintiff and Respondent.

Sonnenschein Nath & Rosenthal, John L. Williams; Cook Brown, Dennis B. Cook and Lisa V. Ryan for Real Party in Interest and Respondent.

Goldfarb & Lipman, Lee C. Rosenthal and Lynn Hutchins for The California Redevelopment Association as Amicus Curiae on behalf of Real Party in Interest and Respondent.

**OPINION**

**RICHMAN, J.**—Labor Code section 1720 embodies the long-standing public policy of California to require employers engaged on public works projects to pay the prevailing wage to their workers if the project is "paid for in whole or in part out of public funds."[1] The novel question presented here is whether tax credits provided by the state to facilitate construction of low-income housing comes within this definition. The trial court concluded that it does. Upon de novo review of the issue, we conclude otherwise—that however worthy the policy goals of encouraging the construction of low-cost housing and ensuring compliance with the prevailing wage requirements, the statutory language in its present form cannot be construed to command that result. Tax credits are, at best, intangible inducements offered by government, but they are not actual or de facto expenditures by government. As such, they do not qualify as either the "payment of . . . the equivalent of money by the state" (subd. (b)(1)), or as a "[t]ransfer by the state . . . of an asset of value for less than fair market price" (subd. (b)(3)), the portions of the definition of "paid for in whole or in part out of public funds" considered here. We thus reverse.

## BACKGROUND

### California's Prevailing Wage Law

California's prevailing wage law (§§ 1720–1861) traces back to 1931, the same year Congress enacted the federal counterpart, commonly known as the Davis-Bacon Act. (Stats. 1931, ch. 397, p. 910; 46 Stat. 1494, as amended, codified at 40 U.S.C. §§ 3141–3148.) Prevailing wage laws were enacted in response to the economic conditions of the Depression, when the oversupply of labor was exploited by unscrupulous contractors to win government contracts when private construction virtually stopped. (See *Universities Research Assn. v. Coutu* (1981) 450 U.S. 754, 774 [67 L.Ed.2d 662, 101 S.Ct. 1451].)

 The Legislature has declared that it is the policy of California "to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to

---

[1] Statutory references are to the Labor Code unless otherwise indicated. The version of section 1720 with which we are concerned is sufficiently lengthy that it has been reproduced as an appendix to this opinion. References to a particular subdivision will be understood as referring to section 1720.

protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards." (§ 90.5, subd. (a).) "This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].)

The prevailing wage law is fairly straightforward in operation. Its general thrust is that "Except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work . . . shall be paid to all workers employed on public works." (§ 1771.) The minimum threshold is increased to $25,000 for "construction work," and $15,000 for "alteration, demolition, repair, or maintenance work." (§ 1771.5.)

"Public works" is given a broad definition, to include "Construction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds, . . . [and] includes work performed during the design and preconstruction phases of construction . . . ." (§ 1720, subd. (a)(1).) The project may involve property that will remain in private hands but will be leased to the state or a political subdivision. (§ 1720.2.) However, the prevailing wage requirement does not apply to work carried out by a public agency with its own employees. (§ 1771.)

The Director of the Department of Industrial Relations (Director) is given the responsibility for determining the general prevailing wage according to statutory criteria. (§ 1770.) The Director fixes the prevailing wage rates for every category of worker needed for a public works project, which are then used by public entities soliciting bids for the project. (§§ 1773, 1773.2.) The Director also has the authority to give opinions as to whether "a specific project or type of work" requires compliance with the prevailing wage law. (Cal. Code Regs., tit. 8, § 16001(a)(1); see *Lusardi Construction Co. v. Aubry, supra*, 1 Cal.4th 976, 988–989.)

A contractor or subcontractor who pays less than the established prevailing rate may be assessed civil penalties (§§ 1741, 1775, 1777.7), may be suspended from bidding or working on public works projects for up to three years (§§ 1777.1, 1777.7), and is also subject to criminal prosecution for failing to maintain payroll records demonstrating compliance (§§ 1776, 1777).

Before the particulars that led to this appeal can be fully understood, a knowledge of the prevailing wage law must be augmented with a description of the low-income housing tax credit (LIHTC) programs.

### The Federal and California LIHTC Programs

■ According to the State Board of Equalization, "The federal low-income housing tax credit program, instituted by the 1986 Tax Reform Act and subsequently codified as section 42 of the Internal Revenue Code [26 U.S.C. § 42]" allows "eligible taxpayers [to] take a credit against federal income taxes due for qualified expenditures involving qualified low-income housing projects. To be eligible for the tax credit, the taxpayer must hold an ownership interest in a low-income housing project for which tax credits have been awarded. In exchange for the tax credits, the project owners agree to operate the project in accordance with the restrictions contained in Section 42 and IRS regulations. Furthermore, as a condition of receiving tax credits, the project owners are required to enter into a recorded regulatory agreement restricting the use of the property to its terms. [¶] . . . [¶] Each year, the federal government allocates a fixed amount of low-income housing tax credits to each state . . . . [¶] Under . . . section 42, each state must annually adopt a qualified allocation plan describing how its annual share of federal tax credits will be allocated among eligible, competing projects. . . .

"The California agency responsible for tax credit allocation, and for developing the state's annual qualified allocation plan, is the California Tax Credit Allocation Committee (CTCAC), a unit of the State Treasurer's Office. CTCAC reviews applications from project developers and allocates the state's federal tax credits on a competitive basis, using the prescribed criteria in . . . section 42 and the additional [tax] criteria contained in CTCAC's own regulations. [See Health & Saf. Code, §§ 50199.8, 50199.10; Cal. Code Regs., tit. 4, §§ 10315, 10325, 10326.] CTCAC currently receives applications for about four times the annual amount of federal tax credits available.[2]

---

[2] Concerning the "amount of federal tax credits available," the California Tax Credit Allocation Committee (CTCAC) states in a 2007 description of the program: "For 2007, each state has an annual housing credit ceiling of $1.95 per capita for . . . Low Income Housing Tax Credits. In addition, States may qualify for a pro rata share of credits available annually in a national pool comprised of states' unused credits. Also, any credits returned to a state from a credit recipient may be allocated to new projects. From the total amount available to

". . . The California Legislature has also authorized a state low-income housing tax credit program to augment the federal program that is also administered by CTCAC."[3] (State Bd. of Equalization, Guidelines for the Assessment of Properties Financed Using Low-Income Housing Tax Credits (July 2005) pp. 1–2, fns. omitted (SBE Guidelines); see Health & Saf. Code, §§ 50199.4–50199.22; Cal. Code Regs., tit. 4, § 10300 et seq.) After the credits have been allocated, they are still subject to "reservations," conditioning their use upon "timely project completion" and its subsequent operation. (Cal. Code Regs., tit. 4, § 10328, subd. (a).) The project when completed must serve low-income tenants "for a period equal to the greater of 55 years or the life of the property." (Rev. & Tax. Code, §§ 12206, subd. (c)(3)(C), 17058, subd. (c)(4)(C), 23610.5, subd. (c)(4)(C); see Health & Saf. Code, § 50199.14, subd. (f).) There is a rigorous "ongoing compliance monitoring" program administered by the IRS and CTCAC. (See Cal. Code Regs., tit. 4, § 10337.) "If a project is found to be in material noncompliance, CTCAC notifies the IRS, which by law may take action to disallow previously-claimed tax credits." (SBE Guidelines, *supra*, at p. 3; see Health & Saf. Code, § 50199.22, subd. (b); Cal. Code Regs., tit. 4, § 10337.)

According to the State Board of Equalization, the existence of tax credits is the principal instrument for achieving the goal of increasing the supply of low-income housing: "The tax credits allocated to a project form the basis for the project's equity financing . . . . Typically, a public or private real estate syndication is the mechanism for converting tax credits allocated to a project into cash proceeds . . . used to develop the project. [¶] A limited partnership is formed, with the developer of the project as general partner. Equity in the tax credit project is sold to investors in the form of limited partnership interests. The buyers of the tax credits become limited partners and equity holders in the . . . project, which entitles them to claim the future tax credits." (SBE Guidelines, *supra*, at p. 4.) "[A]lthough it is commonly stated that the developer of a tax credit project raises equity funds by 'selling the tax credits,' this is not exactly what happens. What in fact are sold are limited

California, the Committee allocates credit amounts based upon assessments of eligible project costs, as defined by IRC Section 42. The housing sponsor uses or sells ten times the allocation amount, since investors can take the annual credit each year for a ten-year period."

[3] The 2007 CTCAC publication also states that the California program was begun in 1987. State LIHTC's are "only available to a project which has previously received, or is concurrently receiving, an allocation of federal credits. Thus the state program does not stand alone, but instead, supplements the federal tax credit program." According to CTCAC, the "annual state credit ceiling for 2007 is approximately $80 million and would be increased by any unused or returned credits from previous years. Investors claim the state credit over a four-year period, rather than the ten-year federal allocation period. The full-four year state credit allocated to a project is deducted from the . . . state ceiling, while only the annual federal credit allocated to a project is deducted from the federal ceiling."

partnership-equity interests in the project that include rights to certain tax credits, not the tax credits per se." (*Id.*, p. 4, fn. 11.)

### The Project and Start of this Dispute

The project at issue is the proposed rehabilitation of the 117 units in the Woodhaven Manor Apartments located in Rancho Cucamonga, San Bernardino County. The rehabilitation is to be done by a limited partnership known as HB Housing Partners (HB Housing). The managing partner of HB Housing is the nonprofit Southern California Housing Development Corporation (Housing Development). Late in 2005, HB Housing executed an agreement with the Rancho Cucamonga Redevelopment Agency, under the terms of which HB Housing would purchase the complex, rehabilitate it, and for a period of 55 years rent all of the apartments to persons earning no more than 60 percent of the area median income. The cost of the project was estimated at $18.6 million, most of which would be obtained by loans from the California Housing Finance Agency and the Rancho Cucamonga Redevelopment Agency. Slightly more than $600,000 would represent state LIHTC's allocated over a four-year period following completion of the rehabilitation.

In August 2005, Housing Development asked the Director for a "coverage determination" that the project was not required to comply with the prevailing wage law because it "does not constitute public works paid for in whole or in part out of public funds." (See Cal. Code Regs., tit. 8, § 16001 [any "interested person" may file a "request to determine coverage under the prevailing wage laws"].) Noting that the Director had already determined that federal LIHTC's did not involve an expenditure of public funds, Housing Development requested that the same reasoning be applied to state LIHTC's.

On November 16, 2005, the Director issued his coverage determination, reaching the result desired by Housing Development. The Director reasoned as follows:

"The federal tax credits do not entail payment out of public funds for the reasons set forth in PW 2004-016, *Rancho Santa Fe Senior Affordable Housing Project* (February 25, 2005). Although state tax credits were not at issue in that case, much of the analysis of federal tax credits is equally applicable to them. However, each of the definitions of 'payment out of public funds' set forth in section 1720(b) requires a payment or other action 'by the state or political subdivision.' Thus it is necessary to examine whether state tax credits fall within any of these definitions.

"Section 1720(b)(1) provides that 'payment of money or the equivalent of money by the state or political subdivision' constitutes payment out of public funds. A tax credit 'involves no expenditure of public moneys received or held . . . but merely reduces the taxpayer's liability for total tax due.' *Center for Public Interest Law v. Fair Political Practices* [*Com.*] (1989) 210 Cal.App.3d 1476 [259 Cal.Rptr. 21]. Accordingly, the allocation of state tax credits is not a payment of money or the equivalent of money within the meaning of section 1720(b)(1).

"Section 1720(b)(3) defines payment out of public funds to include the '[t]ransfer by the state or political subdivision of an asset of value for less than fair market price.' LIHTCs 'do not constitute a right to a payment of money, have no independent value, and are not freely transferable upon receipt.' *Rainbow Apartments v.* [*PTAB* (2001) 326 Ill.App.3d 1105, 1108] [260 Ill.Dec. 875, 762 N.E.2d 534, 537] . . . . Thus a fair market price cannot be assigned to state tax credits, and they are not payment out of public funds within the meaning of section 1720(b)(3).

"Section 1720(b)(4) defines as payment out of public funds to include: [¶] 'Fees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision.'

"While the tax credits may reduce Developer's state income tax obligations, these are not 'obligations that would normally be required in the execution of the contract.' The execution of the contract entails expenditures by, not income to, Developer. The tax credits therefore would reduce tax obligations, if any, on income derived from activities other than construction of the housing.

"Section 1720(b)(6) defines payment out of public funds to include '[c]redits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision.' An income tax is not an obligation to repay money obtained from a governmental entity. Moreover, the state tax credits at issue here are not against any 'repayment obligation' pertaining to this Project, but rather will reduce the tax liability that investors incur on income unrelated to the Project.

"Thus the state tax credits do not constitute payment out of public funds within the meaning of section 1720(b).

"For the foregoing reasons, the Project is not a public work subject to prevailing wage requirements." (*Woodhaven Manor Apartments*, Pub. Works case No. 2005-034, Nov. 16, 2005.)

## Proceedings in the Trial Court

Because the Director designated his decision as precedential, thus allowing it to be relied upon in subsequent determinations (see Gov. Code, § 11425.60), this coverage determination reverberated beyond the specific controversy. The State Building and Construction Trades Council of California (Trades Council), which had initially opposed Housing Development's requested interpretation of the applicability of the prevailing wage law, sought to have the Director's decision reversed by administrative appeal. (See Cal. Code Regs., tit. 8, § 16002.5 ["interested part[y]" may appeal coverage determination].) When that failed, Trades Council commenced this action in February 2006 against the Director and the Department of Industrial Relations (Department); Housing Development was named as "Interested Party."[4]

Trades Council sought a writ of traditional mandate (Code Civ. Proc., § 1085) on the ground that the Director "has abused his discretion and failed to proceed in the manner required by law, in that he misinterpreted and misapplied the law in reaching his opinion that the Project is not a public work subject to California's prevailing wage act."[5] Trades Council prayed that the Director be commanded to set aside his "erroneous decision" and to issue "a new decision that correctly applies the law." Trades Council also asked for declaratory relief "consistent with the . . . contentions as set forth above" if the trial court "concludes that review of the . . . Director's decision is not available under C.C.P. § 1085."

The trial court heard extensive argument on Trades Council's motion for issuance of the writ. In its written order, the court concluded that LIHTC's

---

[4] The California Coalition for Affordable Housing (Coalition) argued on the administrative appeal that the Director's decision was correct and should be upheld. The Coalition describes itself as "an association dedicated to the development and expansion of affordable housing for low income families and persons in the State of California. Its membership consists of both non-profit and profit organizations, builders, developers, lenders, syndicators, management companies, consultants, and public and private agencies committed to the goal of providing affordable housing." After Trades Council started this action, the Coalition sought leave to intervene. The trial court did not allow intervention, but it did permit the Coalition to file a "response" that would be treated as an amicus curiae brief.

[5] The phrasing of this allegation calls to mind the statutory grounds for issuance of a writ of *administrative* mandamus. (See Code Civ. Proc., § 1094.5, subd. (b) ["Abuse of discretion is established if the respondent has not proceeded in the manner required by law . . . ."].) So, too, does the allegation that Trades Council "has exhausted its administrative remedies and the decision of the . . . Director is a final agency action." Moreover, Trades Council also purported to lodge with the court "the . . . Certified Administrative Record prepared by the Department." Nevertheless, it was "traditional mandamus under C.C.P. § 1085" that Trades Council sought, and at no point in the subsequent proceedings did any party suggest that Trades Council was applying for an inappropriate remedy.

qualified as both "payment of money or the equivalent of money by the state . . . directly to or on behalf of the public works contractor, subcontractor, or developer" (§ 1720, subd. (b)(1)), and the "[t]ransfer by the state . . . of an asset of value for less than fair market price" (subd. (b)(3)), which are two of the definitions of "paid for in whole or in part out of public funds" set out in section 1720.

Noting that the plain language of section 1720 "does not expressly list tax credits" in those definitions, the trial court concluded the economic reality of LIHTC's showed that they are "an asset of value." As the court explained: "To hold that LIHTCs are not an 'asset of value' would be inconsistent with the reality of their function in the funding of the project. Even if the tax credits cannot be used immediately, and even if they come with various limitations and conditions, they are obviously an asset of value in some sense. It does not matter that the tax credits have no value except to the owners of limited partnership interests in this particular project. The legislature clearly intended to finance the development of low income housing by issuing these tax credits, and succeeded in doing so, in so far as the tax credits were clearly treated as a source of construction funding by the developer to whom they were issued. The State created the credits and allocated them specifically to [Housing Development's] project to accomplish exactly this result."

The court concluded its thoughtful and tightly reasoned order by ruling that Trades Council was entitled to the writ: "Consideration of the statute as a whole, therefore, leads to the conclusion that LIHTCs come within the scope of either section 1720(b)(1) or, more likely, section 1720(b)(3). [The Director's] prevailing wage determination . . . is therefore in error. The Woodhaven project involves construction done under contract and funded in part by state-issued LIHTCs allocated after December 31, 2003. The use of the state LIHTCs to subsidize the construction means the construction is 'paid for . . . in part out of public funds' within the meaning of section 1720(b) and, therefore, that the workers performing that construction are entitled to be paid prevailing wages."

Separate notices of appeal were filed by Housing Development and by the Director and the Department.[6] We ordered the appeals consolidated.

---

[6] The original notice of appeal filed by Housing Development was from the order granting the petition and ordering issuance of the writ of mandate. Three days later, the clerk of the trial court issued the actual writ. Two weeks after that, Housing Development filed an amended notice from the order and from the writ itself. Three days later, the Director and the Department filed their notice of appeal, also from the order and from the writ. The order is appealable, but the writ is not, and the purported appeals from it must be dismissed.

## DISCUSSION

### I

There is but a single issue before us, namely, whether the LIHTC's involved in the financing make the project a "public work" requiring workers to be paid the prevailing wage. In deciding this issue, we have had the benefit of highly competent briefs filed by the parties. In addition, Trades Council is also supported with an amicus curiae brief from the State Treasurer, while the California Redevelopment Association and the California Building Industry Association have submitted amicus curiae briefs behind the Director and the Department. But before we address the merits, we must settle the issue of our standard of review—specifically, how much, if any, deference must we pay to the Director's coverage determination.

The broad question of the deference due to administrative decisions has perplexed some of our best judicial minds. (See maj. opn. of Brown, J., and conc. opn. of Mosk, J., in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [citing, e.g., *Wilkinson v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491 [138 Cal.Rptr. 696, 564 P.2d 848] (Tobriner, J.); *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593] (Sullivan, J.); *Whitcomb Hotel, Inc. v. Cal. Emp. Com.* (1944) 24 Cal.2d 753 [151 P.2d 233] (Traynor, J.); *Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321 [109 P.2d 935] (Gibson, C. J.); see also *Dare v. Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 803 [136 P.2d 304] (conc. & dis. opn. of Traynor, J.); *Laisne v. Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 848 [123 P.2d 457] (dis. opn. of Gibson, C. J.).) Fortunately, we are not required to make an original contribution to this topic.

The parties and one amicus curiae devote a considerable amount of space in their briefs to the issue of whether the Director's coverage determination was the equivalent of an established administrative interpretation of a statute by the official responsible for administering that statute, and thus a quasi-legislative rule entitled to our deference. (See generally *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th 1, 6–11 (*Yamaha*).) There are three compelling reasons why there is not much, if any, deference due.

First, following completion of briefing for this appeal, the Director discontinued the practice of designating coverage determinations as precedential; he

---

(*DeMartini v. Department of Alcoholic Beverage Control* (1963) 215 Cal.App.2d 787, 794 [30 Cal.Rptr. 668]; *Butler v. City & County of San Francisco* (1951) 104 Cal.App.2d 126, 128 [231 P.2d 75].)

also stripped prior determinations of precedential value, and announced that past and future coverage determinations would be "advisory . . . only." The obvious conclusion is that the Director and the Department have jettisoned a general interpretation of whether LIHTC's meet the statutory definition of a public work "paid for in whole or in part out of public funds," and adopted a case-by-case approach using good-for-one-time-only decisions on specific projects. In other words, coverage determinations are no longer, if they ever were, treated as quasi-legislative by the Department itself. (See Cal. Code Regs., tit. 8, § 16303 [declaring that the Director's authority "to establish the prevailing wage for any craft, classification, or type of worker is quasi-legislative," and "[a]ny hearing under this process is quasi-legislative . . . ."]; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 574–575 [59 Cal.Rptr.2d 186, 927 P.2d 296] ["A written statement of policy that an agency intends to apply generally . . . and that predicts how the agency will decide future cases is essentially legislative in nature . . . ."].)

Second, and just as significant, judicial deference to an administrative interpretation of a statute is extended if the interpretation is long-standing, consistent, and if the interpretation was contemporaneous. (*People v. Cole* (2006) 38 Cal.4th 964, 987 [44 Cal.Rptr.3d 261, 135 P.3d 669]; *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1012 [32 Cal.Rptr.3d 89, 116 P.3d 550]; *Yamaha, supra*, 19 Cal.4th 1, 7, 13.) Such is not the case here.

The Director's coverage determination is less than two years old, so it hardly qualifies as long-standing. Moreover, that determination reversed the Department's position taken in 2003, that LIHTC's *did* make a project a public work "paid for in whole or in part out of public funds" within the meaning of section 1720. (*1010 Pacific Apartments*, Pub. Works case No. 2002-070, June 30, 2003.)[7] The Director's current reading of section 1720 thus hardly qualifies as consistent. "[W]hen an agency's construction ' "flatly contradicts" ' its original interpretation, it is not entitled to 'significant deference.' " (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1105, fn. 7 [56 Cal.Rptr.3d 880, 155 P.3d 284], quoting *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1278 [252 Cal.Rptr. 278, 762 P.2d 442].) Put more bluntly, " '[a] vacillating position . . . is entitled to no deference.' " (*Yamaha, supra*, at p. 13.)[8]

---

[7] The Director expressly "overruled" the *Pacific Apartments* decision in the *Rancho Santa Fe* decision, which was in turn cited in the coverage determination quoted above for the project at issue here.

[8] The *Yamaha* court was quoting from the Tentative Recommendation of the California Law Revision Commission concerning Judicial Review of Agency Action (Aug. 1995) page 11 reprinted in 27 California Law Revision Commission Reports (1996) 309, 349, prepared by Professor Michael Asimow. The substance of the recommendation was also printed in Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42

■ Third, and most importantly, the nature of the issue before us involves the quintessential judicial function. Because the issue here is a pure one of statutory interpretation, this is not a situation where the administrative agency " 'has a comparative interpretative advantage over the courts.' " (*Yamaha, supra*, 19 Cal.4th 1, 12, quoting Cal. Law Revision Com., Tent. Recommendation, Judicial Review of Agency Action, *supra*, at p. 11; see *People v. Cole, supra*, 38 Cal.4th 964, 987; *Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1264–1265 [8 Cal.Rptr.3d 532, 82 P.3d 740].) Statutory language is not something "where the materials are technical and engage an agency's expertise." (Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies, supra*, 42 UCLA L.Rev. 1157, 1204.) To the contrary, it is the judiciary which has the ultimate authority for determining the meaning of a statute. (*Yamaha, supra*, at pp. 11–12; *Culligan Water Conditioning v. State Bd. of Equalization, supra*, 17 Cal.3d 86, 93 [" 'the ultimate resolution of . . . legal questions rests with the courts' "]; *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697] [" 'Whatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts.' "]; see Cal. Const., art. III, § 3.5 [only appellate courts, not administrative agencies, can declare laws invalid].)

Nevertheless, the opinion of an administrative agency as to a statute's meaning may be helpful even if it is "not binding or necessarily even authoritative." (*Yamaha, supra*, 19 Cal.4th 1, 8; accord, *Sara M. v. Superior Court, supra*, 36 Cal.4th 998, 1011.) "Courts must, in short, independently judge the text of the statute, taking into account and respecting an agency's interpretation of its meaning, of course, whether embodied in a formal rule of less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Yamaha, supra*, at pp. 7–8.)

In short, while we consider the Director's current interpretation of section 1720, we do not extend that interpretation any particular deference. Because there is no factual dispute, only the question of how that statute is to be construed and applied, we exercise our independent judgment. (*Murphy v. Kenneth Cole Productions, Inc., supra*, 40 Cal.4th 1094, 1105, fn. 7; *City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949, 951 [22 Cal.Rptr.3d 518, 102 P.3d 904] (*City of Long Beach*) [discussed in fn. 11, *post*]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th

UCLA L.Rev. 1157, 1197. The Supreme Court subsequently praised Professor Asimow's work as "highly persuasive." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 9, fn. 5 [50 Cal.Rptr.3d 585, 145 P.3d 462].)

415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) Before addressing the merits of the pure legal issue before us, we first examine the history of section 1720 in this court, and the legislative aftermath.

## II

The precise issue here may be novel, but its general context has previously been before this court, in *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576 [18 Cal.Rptr.2d 680] (*McIntosh*), where we considered the Director's conclusion that a project was not a "public work" and thus did not require payment of prevailing wages. The project there was to be a privately run residential shelter for emotionally disturbed or abused minors. The facility was to be constructed on acreage leased by the county that it would sublease, rent free, to the developer for 20 years. The trial court denied mandamus to overturn the Director's decision. (*Id.* at p. 1580.) We affirmed, on the basis of section 1720 as it then read,[9] reasoning that the county's forbearance of rent did not qualify as a "payment" of "public funds":

" 'To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]' [Citation.] The full [statutory] phrase here is 'paid for in whole or in part out of public funds' (§ 1720, subd. (a)). Does it encompass the forbearance of rent? The verb 'pay,' standing alone, can in its usual and ordinary sense include the transfer of things other than money. It means 'to satisfy (someone) for services rendered or property delivered' or to 'discharge an obligation'; 'PAY is a general term, usu[ally] lacking particular connotation but sometimes bluntly stressing the purchase of services . . . .' (Webster's Third

---

[9] At the time, section 1720 provided:

" 'As used in this chapter, "public works" means:

" '(a) Construction, alteration, demolition or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority.

" '(b) Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. 'Public work' shall not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages.

" '(c) Street, sewer, or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not.

" '(d) The laying of carpet done under a building lease-maintenance contract and paid for out of public funds.

" '(e) The laying of carpet in a public building done under contract and paid for in whole or in part out of public funds.

" '(f) Public transportation demonstration projects authorized pursuant to Section 143 of the Streets and Highways Code.' " (*McIntosh, supra,* 14 Cal.App.4th 1576, 1584, fn. 8.)

New Internat. Dict. (1965) p. 1659.) Even '[i]n a more restricted legal sense[,] payment is the performance of a duty promise, or obligation . . . by the delivery of money or other value'—'the delivery of money or its equivalent . . . .' (Black's Law Dict. (6th ed. 1990) p. 1129.)

"However, the 'payment' here must be 'out of public funds' (§ 1720, subd. (a)). The word 'funds' is not specially defined in the statute but 'has a well-established meaning in common parlance . . . . The dictionary defines it as "available pecuniary resources ordinarily including cash and negotiable paper" [citation], and in a legal context the courts have also taken it to include property of value which may be converted into cash [citations].' [Citation.] The county's right to charge rent is not an available pecuniary resource like cash or some readily cash-convertible asset. To take rent *collected* from one source and use it to pay obligations would plainly be a payment of public funds, but the County here will not collect the rent. Nor, according to our record, will it lose appreciable rents it otherwise might have charged for the acreage in its unimproved state. Also, it may be more accurate to view uncharged rent over 20 years as an ongoing subsidy of contracted-for *services* rather than the initial *construction*. The contract originally envisioned only a year of construction, during which time, of course, the commercial value of the land would be at its lowest.

"The forbearance of rent here, while valuable as a negotiating tool in securing the total project, does not fit comfortably into the idea of 'construction' 'paid for . . . out of public funds.' Plaintiffs attribute the ill fit to changing times: words which were easy to apply when counties contracted for projects directly have become awkward in a post-Proposition 13 age when cash-poor counties turn increasingly to alliances with private industry. In plaintiffs' view, we must expand the meaning of anachronistic language to fit the realities of the present, or risk frustrating legislative intent.

"We view the situation differently. Courts will liberally construe prevailing wage statutes [citations], but they cannot interfere where the Legislature has demonstrated the ability to make its intent clear and chosen not to act [citations]. We do not share plaintiffs' view that the Legislature has overlooked changes in county needs or practices in this area. It has in fact been active. It . . . has regularly amended the prevailing wage law to keep pace with evolving realities. Section 1720.2 was such a reaction, as was the 1989 addition of section 1720.4 and subdivision (f) of section 1720 . . . .[10] Those balanced solutions show current awareness by the Legislature. We adhere to

---

[10] As previously mentioned, section 1720.2 requires payment of prevailing wages for projects that remain privately owned but are leased to a governmental entity. Section 1720.4 excludes from the category of public works projects built with volunteer labor or to be used by nonprofit or charitable organizations.

the plain meaning of section 1720, subdivision (a), and decline to read it more expansively." (*McIntosh, supra,* 14 Cal.App.4th 1576, 1588–1589.)

Although it was not an express term of the contract between the county and the developer, it appears that during the construction process in *McIntosh* the county incurred inspection costs that would ordinarily have been charged to the developer, but in fact were absorbed by the county. We held that these expenses likewise did not qualify as the payment of public funds:

"The *nature* of the costs is important, and is undisputed. The County waived costs it normally charges for routine inspections and allocated them between departments for internal accounting purposes. . . . [¶] We hold that the cost waivers were not public funds paid for construction (§ 1720, subd. (a)). Like the forbearance of rent, these 'costs' involve no payment of funds out of county coffers. Legislators could easily express an intent to bring waived costs (or rent) within the concept of payment with 'public funds' but have not done so. A holding that waived inspection costs are partial payments from public funds could make public works of any project where a county has used cost waivers as incentives to development, even though the project may serve purely private needs. The statute gives no warning that this result was intended." (*McIntosh, supra,* 14 Cal.App.4th 1576, 1589–1590.)[11]

*McIntosh* generated repeated attempts in the Legislature to modify or overturn it. These efforts culminated in the passage of Senate Bill No. 975 (2001–2002 Reg. Sess.) in 2001. (Stats. 2001, ch. 938, § 2.) The bill was sponsored by the Trades Council. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 975 (2001–2002 Reg. Sess.) as amended Aug. 30, 2001, p. 1.) It began modestly as an amendment of Government Code section 63036, a provision of the statutory scheme for the California Infrastructure and Economic Development Bank (Gov. Code, § 63000 et seq.), to simply provide that "all public works" financed by the bank, "including those projects financed through the use of industrial development bonds . . . shall comply" with the prevailing wage law. (Sen. Bill No. 975 (2001–2002 Reg. Sess.) § 1.) It cleared the Senate Government Operations Committee on April 24, 2001, and was passed by the full Senate two days later.

---

[11] *McIntosh* is also notable because we held that "whether stipulated facts showed a public work[] posed a question of law," and that in resolving that question we would exercise our independent judgment and not defer to the Director's conclusion on that question. (*McIntosh, supra,* 14 Cal.App.4th 1576, 1583–1584.) The Supreme Court subsequently endorsed this reasoning. (*City of Long Beach, supra,* 34 Cal.4th 942, 949.) As shown in part I, *ante,* the Supreme Court's *Yamaha* decision did not undercut the approach we adopted in *McIntosh* and use here.

It was the Assembly which began amending section 1720 as it then read. (See fn. 9, *ante.*) The first amendment would have added a subdivision (g), to the effect that " 'paid for in whole or in part out of public funds' includes, but is not limited to, the payment of money or the equivalent of money by a public agency directly to or on behalf of the public works contractor or developer, performance of work in execution of the project, transfer of an asset of value for less than fair market price, or payment or waiver of fees, costs, rents, or other obligations that would normally be required in the execution of the contract." (Assem. Amend. to Sen. Bill No. 975 (2001–2002 Reg. Sess.) June 25, 2001, italics omitted.)

The bill was again amended to move this language to subdivision (b) so that it would provide: "For purposes of this section, 'paid for in whole or in part out of public funds' . . . means the payment of money or the equivalent of money by a state or local public agency directly to or on behalf of the public works contractor, subcontractor, or developer, performance of construction work by the state or local public agency in execution of the project, transfer of an asset of value for less than fair market price . . . ; fees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, which are paid, reduced, charged at less than fair market value, waived, or forgiven . . . ; or credits applied against repayment obligations." (Assem. Amend. to Sen. Bill No. 975 (2001–2002 Reg. Sess.) July 10, 2001, italics omitted.)

Two days later, the Assembly amended the bill for a third time, this time adding as subdivision (e) the language now found in section 1720, subdivision (c)(4). (Assem. Amend. to Sen. Bill No. 975 (2001–2002 Reg. Sess.) July 12, 2001.) The bill was amended for the fourth time by the Assembly on July 18, 2001, to specify that " 'paid for in whole or in part out of public funds' shall not include tax credits provided pursuant to Section 17053.49 or 23649 of the Revenue and Taxation Code." (Assem. Amend. to Sen. Bill No. 975 (2001–2002 Reg. Sess.) July 18, 2001, italics omitted.)

Senate Bill No. 975 (2001–2002 Reg. Sess.) was amended for the fifth, and final time by the Assembly on August 30, 2001. This was the version passed by the Legislature and signed by Governor Davis on October 14, 2001. Although minor changes were enacted the following year (Stats. 2002, ch. 1048, § 1), the final version of Senate Bill No. 975 is essentially the version of section 1720 with which we are concerned.

As statutes go, section 1720 is hardly a triumph of the drafter's art.

The problem starts with subdivision (a), which defines "public works" as various categories of work "done under contract" and "paid for in whole or in part out of public funds," and subdivision (b), which enumerates what is meant by the latter clause. Of the two, subdivision (b) is obviously more important for present purposes. As definitional provisions of a statute in a statutory scheme that has traditionally received a liberal construction (as we noted in *McIntosh*), one would expect these provisions to be prefaced with the familiar wording that the definition "includes" or, more broadly still, "includes but is not limited to," particularly as this was a bill intended to broaden the scope of section 1720. In fact, the first Assembly amendment used the broader language, but it was subsequently deleted. Instead, in both subdivisions (a) and (b) the Legislature employed the word "means," a term accepted as one of limitation, not enlargement. (See 2A Singer & Singer, Sutherland Statutes and Statutory Construction (7th ed. 2007) § 47:7, p. 305; *Brown v. Scott Paper* (2001) 143 Wn.2d 349 [20 P.3d 921, 926].) And conspicuous by their absence from subdivision (b) are the words "tax credits," an omission only made more glaring by subdivision (b)(6), which includes this within the definition of "paid for in whole or in part out of public funds": "Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision."

However, the Legislature was not content to halt with subdivision (b). It went on in subdivision (c) to specify a number of situations that might be included—or excluded—as "paid for in whole or in part out of public funds." The most pertinent of these exclusions is subdivision (c)(5), which unambiguously states that " 'Paid for in whole or in part out of public funds' *does not include tax credits* provided pursuant to Section 17053.49 or 23649 of the Revenue and Taxation Code."[12] (Italics added.)

But there is more. Subdivision (d) identifies three types of projects that "shall not, *solely by reason of this section*, be subject to the requirements" of the prevailing wage law. (Italics added.) All of the three situations are expressly pegged to projects already commenced "on or before December 31, 2003," one of which is precisely the type of that at issue here: "Low income housing projects that are allocated federal or state low-income housing tax credits pursuant to Section 42 of the Internal Revenue Code [or] Chapter 3.6 of Division 31 (commencing with Section 50199.4) of the Health and Safety Code . . . ."

---

[12] The first of the cited provisions of the Revenue and Taxation Code was repealed by a 1999 enactment that took effect January 1, 2004 (Stats. 1999, ch. 987, § 6); the second was repealed by a 2001 enactment that also took effect January 1, 2004 (Stats. 2001, ch. 543, § 35).

It is more than a little confusing to attempt to discern a consistent logic to subdivisions (b), (c), and (d). Subdivision (b) specifies that its enumerated categories are what " 'paid for in whole or in part out of public funds' means." Subdivision (c) is a true hodgepodge: it designates two categorical exclusions from the prevailing wage law (subd. (c)(4), (5)), but the remaining four categories of project may or may not be exempt depending on the circumstances. Subdivision (d) then sets out three types of projects that "shall not, *solely by reason of this section*, be subject to the requirements" of the prevailing wage law. (Italics added.) A careful reader is naturally inclined to wonder if subdivision (d) is simply an extension of subdivision (c) and whether both serve the same functions, namely, adding and subtracting from the public funds definition of subdivision (b).

■ This is the raw material with which we must grapple to resolve these appeals. That resolution turns on the construction we give to section 1720. That construction is not to be reached by examining bits and pieces of the statute, but after a consideration of all parts of section 1720 in order that we may effectuate the Legislature's intent. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563]; *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 292 [132 Cal.Rptr.2d 713, 66 P.3d 718]; *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040 [130 Cal.Rptr.2d 672, 63 P.3d 228].) In the rare case, widening the analytical aperture brings additional difficulties: "Statutory language which seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context." (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371 [64 Cal.Rptr.2d 741].)

Such is the case here. We cannot look at subdivision (b) by itself, because subdivisions (c) and (d) address the same subject, namely, what is encompassed by subdivision (b)'s definition of what constitutes a public work "paid for in whole or in part out of public funds." In addition, just what is meant by "credits" cannot yield a single answer because the Legislature did not use the word in the same and consistent sense. (See *People v. Nguyen* (1999) 21 Cal.4th 197, 205 [87 Cal.Rptr.2d 198, 980 P.2d 905]; *Hoag v. Howard* (1880) 55 Cal. 564, 565.) With these provisos, we come at last to the issue of whether LIHTC's are within the section 1720 definition.

### III

Both the Director and Housing Development argue for reversal on the basis of the reasoning in the Director's coverage decision, and the spirit of our decision in *McIntosh*. Stripped to its essentials, their argument is that giving a tax credit does not amount to paying out public funds. A tax credit has no intrinsic value to the state. It is not sold by the state. It cannot be stolen from

the state. And in allocating a tax credit, the state parts with nothing of any realizable monetary worth. It thus is not "[t]he payment of money or the equivalent of money by the state" (subd. (b)(1)), nor is it a "[t]ransfer by the state . . . of an asset of value for less than fair market price" (subd. (b)(3)). After careful consideration of the issue, we agree with the Director and Housing Development.

There is nothing in the language of subdivision (b) that furnishes a basis for concluding that the Legislature intended to overthrow the *McIntosh* ordinary meaning approach to determining what qualifies as "paid for in whole or in part out of public funds." Indeed, precisely the opposite appears true, that the trigger for application of the prevailing wage law carried over from the *McIntosh*-era version of section 1720 (quoted at fn. 9, *ante*) is still the payment of public funds. The various provisions of section 1720, subdivision (b), demonstrates that the Legislature was guided by the *McIntosh* language that "payment" meant " 'the delivery of money or its equivalent.' " (*McIntosh, supra,* 14 Cal.App.4th 1576, 1588.)

■ The statutory emphasis is very much upon the tangibility and form of the payment. The Legislature virtually adopted our *McIntosh* formulation in subdivision (b)(1), which defines " 'paid for in whole or in part out of public funds' " as first and foremost the "payment of money or [its] equivalent." "Transfer . . . of an asset of value for less than fair market price," and "Fees, costs, rent, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than fair market value" (subd. (b)(3), (4)) are obviously in the same vein. So is "Money loaned" when repayment is not guaranteed. (Subd. (b)(5).) It is not hard to understand that extending "Credits that are applied . . . against repayment obligations" (subd. (b)(6)) is simply money that would otherwise be paid. And there is certainly a cash value if the state actually undertakes "Performance of construction work . . . in execution of the project." (Subd. (b)(2).)

Moreover, subdivision (b)(1) and (3) speak to the state or political subdivision parting with a thing possessing current value. Within the definition of "paid for in whole or in part out of public funds" is "The payment of money or the equivalent of money by the state or political subdivision" specified by subdivision (b)(1). Subdivision (b)(3) includes in the same definition the "Transfer by the state or political subdivision of an asset of value for less than fair market price." It is significant that both of these provisions are couched in the present tense. By contrast, when the Legislature meant to refer

to an exchange occurring in the future, it used language to reflect that expectation, as in subdivision (b)(5), which places within the definition "Money loaned by the state or political subdivision *that is to be repaid on a contingent basis*." (Italics added.)

 Even more significant is subdivision (b)(6), which speaks to "Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision." "Repayment" in this context can hardly refer to a private contract where no moneys are advanced by the state that can be owing—and thus there is nothing to be "repaid." If the Legislature had intended that LIHTC's be included with subdivision (b), one would naturally expect to see something like the language of subdivision (d)(3) in subdivision (b). That absence cannot be without meaning. " 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' " (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [257 Cal.Rptr. 708, 771 P.2d 406] (*Brown*); accord, *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 364 [127 Cal.Rptr.2d 516, 58 P.3d 367] ["when different terms are used in parts of the *same* statutory scheme . . . they are presumed to have different meanings"].)

There is, moreover, an impressive body of authority, much of which was cited by the Director in his coverage decision, that excludes tax credits from the category of goods and services that amount to public assets or are treated as the equivalent of money. For example, within the context of California's personal income tax system, a credit is treated as something that "involves no expenditure of public moneys received or held . . . but merely reduces the taxpayer's liability" at a future point in time. (*Center for Public Interest Law v. Fair Political Practices Com., supra,* 210 Cal.App.3d 1476, 1486.) Federal tax law is to the same effect: it likewise does not recognize receipt of a tax credit as a taxable event, on the theory that the taxpayer "has received no money or other 'income' within the meaning of the Internal Revenue Code." (*Randall v. Loftsgaarden* (1986) 478 U.S. 647, 657 [92 L.Ed.2d 525, 106 S.Ct. 3143] (*Randall*).)[13] The credits "have no value in themselves," only the

---

[13] Trades Council argues that *Randall* is "off point" because it "involved the treatment of tax deductions under a completely different statutory definition, it is of no relevance here." This attempt to dismiss *Randall* as factually distinguishable will not succeed.

The question as framed by the Supreme Court in *Randall* was "whether the recovery available to a defrauded tax shelter investor, entitled under § 12(2) of the Securities Act of 1933 . . . to rescind the fraudulent transaction or obtain rescissory damages, must be reduced by any tax benefits the investor has received from the tax shelter investment." (*Randall, supra,* 478 U.S. 647, 649.) The court answered in the negative. It is true that the statutory measure of damages is couched in different statutory language than section 1720, but the underlying concept—whether the loss of tax deductions or tax credits constituted lost income to the

contingent benefit "to reduce the taxes otherwise payable." (*Randall*, at p. 657; see also *id.*, at pp. 657–659 [credits have "economic value" only indirectly to extent they reduce tax liability].)

Both California and the federal courts have declined to treat tax credits as sufficiently substantial to offset civil damage awards. (*DePalma v. Westland Software House* (1990) 225 Cal.App.3d 1534, 1539–1543 [276 Cal.Rptr. 214]; *Randall*, *supra*, 478 U.S. 647, 662–667.) For purposes of California's criminal law, a tax credit is not a "public money" that can be misappropriated. (*Center for Public Interest Law v. Fair Political Practices Com.*, *supra*, 210 Cal.App.3d 1476, 1486; see Pen. Code, §§ 424–426.) Federal law follows a similar approach: "Unissued tax credits have zero intrinsic value" and thus "are not property" when they in the possession of the allocating state agency. (*U.S. v. Griffin* (5th Cir. 2003) 324 F.3d 330, 354 (*Griffin*).)

█ It is true that certain references to an LIHTC being "sold" can be found in reported decisions. (E.g., *Griffin*, *supra*, 324 F.3d 330, 355; *Marysville Properties, L.P. v. Nelson* (Mo.Ct.App. 2002) 83 S.W.3d 608, 611.) But this is misleading unless substantially qualified. A person or entity cannot be allocated a LIHTC and immediately sell it on any street corner. The housing project must be completed and made operational before the credit begins to appear on a tax return. Thereafter, the project may be sold, but the LIHTC is transferred with the property; the LIHTC cannot be sold separately. As the State Board of Equalization puts it: "Under IRC section 42, low income housing tax credits may only be claimed by owners of qualifying low-income housing; that is, the tax credits cannot be claimed unless the taxpayer also holds a concomitant equity interest in a low-income housing project." (SBE Guidelines, *supra*, p. 4, fn. 11; see 26 U.S.C. § 42(d)(7), (f)(1), (4), (5).)

Even the most prominent of the authorities using the word "sale" agrees with this limitation: "Once tax credits have been allocated, they cannot be transferred from the property to which they were allocated. . . . Once the tax credits have been issued *on a property*, the owner can sell limited partnership interests *in the property* so that investors can take advantage of the tax credits allocated *to that project*." (*Griffin*, *supra*, 324 F.3d 330, 354–355, italics

---

investor—hardly makes the decision "off point." *Randall* was concerned with the economic value of tax credits in the hands of the recipient, while we are considering the converse issue of whether there is any economic value of tax credits before they are released to the recipient. If, as the Supreme Court held, the recipient gets nothing of value, it would necessarily follow that the grantor has parted with nothing of value. *Randall* has obvious relevance to our inquiry here.

added.) Moreover, the State Board is equally explicit that "previously-claimed tax credits" may be "disallowed" if the project falls out of compliance with the terms of the developer's regulatory agreement with the state. (SBE Guidelines, *supra*, at p. 3; see Cal. Code Regs., tit. 4, § 10328, subd. (a).) This is hardly the unqualified finality one would ordinarily associate with a "sale."

Courts across the country have, in the main, adopted this view of the LIHTC's existence and alienability. (E.g., *Brandon Bay v. Payette County* (2006) 142 Idaho 681 [132 P.3d 438, 441] ["The tax credits . . . do not exist separate from an ownership right in the low-income housing."]; *Pine Pointe v. Lowndes County, etc.* (2002) 254 Ga.App. 197 [561 S.E.2d 860, 863] ["if a property eligible for Section 42 tax credits is sold, then the subsequent owner . . . is entitled to the future tax credits associated with the property"]; *Rainbow Apartments v. PTAB, supra*, 762 N.E.2d 534, 537 ["The benefit of a tax credit . . . is entirely incidental . . ." to ownership.].) More than 20 years ago the United States Supreme Court characterized as "obvious" the logic underlying the connection between ownership and the right to claim a tax credit. (*Randall, supra*, 478 U.S. 647, 666.)[14]

Following that approach, Illinois courts have held that "Tax credits, as *Randall* instructs us, have no independent value in and of themselves; instead, they are an incidental benefit that investors receive when they purchase . . . their interest in a limited partnership. The investors cannot transfer or sell the tax credits separate from the [partnership interest] itself. The limited partnership did not 'sell' the tax credits to the investors; the tax credits remain exactly where they resided before . . . in the limited partnership." (*Chicago v. Michigan Beach Housing Coop.* (1993) 242 Ill.App.3d 636 [182 Ill.Dec. 343, 609 N.E.2d 877, 886]; accord, *Rainbow Apartments v. PTAB, supra*, 762 N.E.2d 534, 537.) We agree entirely. The arguments to the contrary are not persuasive.

Trades Council argues that state LIHTC's are "the equivalent of money" within the meaning of subdivision (b)(1) because "they have an immediate and ascertainable cash value on a well-established syndication market" as

---

[14] The reasoning of the court shows why we regard *Randall* as valuable to our analysis: "Respondents essentially ask us to treat tax benefits as a separate asset that is acquired when a limited partner purchases a share in a tax shelter partnership. But the legal form of the transaction does not reflect this treatment. Petitioners purchased securities, thereby acquiring freely alienable rights to any income that accrued to them by virtue of their ownership. *They did not, however, also acquire a separate, freely transferable bundle of tax losses that would have value apart from [their] status as partners.* For obvious reasons, tax . . . credits are not, in the absence of a statutory provision to the contrary, freely transferable from one person to another if wholly severed from the property or activity to which they relate . . . ." (*Randall, supra*, 478 U.S. 647, 665–666, italics added.)

shown by the fact the state is aware that "LIHTCs will immediately be converted to cash to pay for construction of the project." This may be so, but it is irrelevant. The fact that LIHTC's may indeed be marketable *by others*, *after* they have been allocated by the state, does not establish that they have a realizable monetary worth *to the state before* they are allocated. (See *Griffin*, *supra*, 324 F.3d 330, 355 ["the only property interest the State has in the tax credits is purely abstract or theoretical, even after [the project] is completed"].) Moreover, as previously established, it is actually interests in the property that are sold; the tax credits are merely an incidental feature of purchasing ownership. (*Chicago v. Michigan Beach Housing Coop.*, *supra*, 609 N.E.2d 877, 886; *Rainbow Apartments v. PTAB*, *supra*, 762 N.E.2d 534, 537.)

In arguing that LIHTC's amount to "an asset of value" for purposes of subdivision(b)(3), Trades Council notes that "California tax law was very recently amended to *exclude* the value of LIHTC's from the assessed value of real property. (Stats. 2004, ch. 786). If tax credits had no value as a matter of law, this recent tax statute would have been unnecessary." Not at all. The question had divided the courts of the nation (see *Huron Ridge v. Ypsilanti Twp* (2007) 275 Mich.App. 23 [737 N.W.2d 187] and decisions cited), so it would be eminently logical for the Legislature to provide a clear answer and resolve any uncertainty. Further, and as just noted, the fact that LIHTC's may acquire value in the hands of a subsequent holder does not establish that they had value before they were allocated by the state. In sum, we do not conclude that LIHTC's have "no value as a matter of law" for all time—only that their allocation by the state is not a transfer "of an asset of value for less than fair market value."

Trades Council reasons that "LIHTCs entitle the holder to a dollar-for-dollar offset of unrelated tax liabilities. To persons or [entities] with tax liabilities, who would otherwise be required to pay that money to the State, the tax credit is an 'asset of value' for which they are willing to pay." True enough, but the operative point is that the purchase price is not paid to the state. The value for which would-be buyers pay accrues when the LIHTC's come within the disposition of the developer for the project, not the state. It is from the developer, not the state, that "persons or entities with tax liabilities" purchase an ownership interest in the underlying project. The buyer realizes the value of the tax credit only when—and if—the project is completed in a

timely fashion, becomes operational, and remains so for a number of years.[15] (See Health & Saf. Code, § 50199.14, subd. (f); Rev. & Tax. Code, §§ 12206, subd. (c)(3)(C), 17058, subd. (c)(4)(C), 23610.5, subd. (c)(4)(C); Cal. Code Regs., tit. 4, § 10328, subd. (a); *Griffin, supra,* 324 F.3d 330, 355.)

Trades Council argues that "The LIHTCs were allocated to the Developer for no consideration," and were "thus transferred for less than their fair market price." We are not persuaded. While we do not disagree with the trial

---

[15] Trades Council requests that we take judicial notice of various documents concerning the details of the HB Housing project and the LIHTC program. There being no objection, the request is granted.

One of those documents is of particular interest here—the "Reservation Letter Tax Exempt with State Credits" dated September 28, 2005, sent to HB Housing by CTCAC. In it, HB Housing was expressly told of the conditions precedent to the LIHTC's becoming effective:

"The Preliminary Reservation is conditioned upon the Project Applicant . . . constructing, rehabilitating or acquiring and rehabilitating the Project in accordance with the application for low-income housing tax credits" HB Housing had submitted to CTCAC. "No change in the owner, general partner(s) of the owner, or any members of a Limited Liability Company that has an ownership interest in the Project shall occur prior to final award of the Tax Credits without the prior written consent of [C]TCAC. If such consent is given, this Preliminary Reservation is binding on all successors and assigns."

"Within one year from the project's actual placed in service date, the Applicant must request from [C]TCAC the issuance of IRS Form(s) 8609 and submit the required documentation as specified in [California Code of Regulations, title 4,] section 10328(e). . . .

"This Reservation is further conditioned upon the project owner's constructing, purchasing, or rehabilitating the project in accordance with the application submitted to [C]TCAC and upon the owner placing the project in service within the time periods allowed by law and regulation. The reservation may be rescinded if satisfactory progress toward completion is not maintained."

"Before issuance of IRS Form 8609 . . . the project owner will be required to sign a . . . Regulatory Agreement which will bind current and future owners to covenants previously agreed to by the project owner and [C]TCAC. The project will be monitored by [C]TCAC for the duration for the compliance period to ensure that the project is abiding by all covenants. . . .

"[¶] . . . [¶] By accepting this Preliminary Reservation, the owner understands and accepts the risks that the U.S. Congress, U.S. Department of the Treasury or the State of California may change the requirements for the award of tax credits by subsequent enactment or regulation. . . .

"Applicant acknowledges that, in awarding tax credits, . . . [C]TCAC makes no representation that such credits can be claimed by Applicant. Applicant further acknowledges that upon its failure to meet any of the requirements in this Preliminary Reservation or . . . any other requirements of [C]TCAC . . . , the Project's reservation may be cancelled and the credits returned to [C]TCAC. Moreover, even after the reservation of tax credits, the amount of such reservation may be adjusted if, upon the initial and subsequent feasibility determinations, [C]TCAC determines that the Project received more credits than are necessary for financial feasibility of the Project. In addition, [C]TCAC may rescind a reservation of credits in the event that the maximum amount of credits available is insufficient for financial feasibility of the Project." The signature of its chief financial officer reflected HB Housing's acceptance of these terms and conditions.

In fairness to the trial court, we feel compelled to note that the material produced before it was far less developed than is the record on appeal we have examined.

court's conclusion that LIHTC's "are obviously an asset of value in some sense," the issue here is whether LIHTC's qualify as an asset of value to the state when they were allocated by CTCAC, acting for the state. We hold they do not. The value of the LIHTC's is at that point merely latent. Their potential for economic worth is not realized until after the project has been completed and they can be used to neutralize certain tax liabilities. Thus, the factual nexus between the allocation of the LIHTC's and the anticipated construction or alteration is at that moment in time only contingent, indirect, and incidental. (*Randall, supra,* 478 U.S. 647, 656–659; *Chicago v. Michigan Beach Housing Coop., supra,* 609 N.E.2d 877, 886.)

The situation is more akin to the loss of rent faced by the county in *McIntosh.* Concerning this forbearance of rent, we noted that "The county's right to charge rent is not an available pecuniary resource like cash or some readily cash-convertible asset." (*McIntosh, supra,* 14 Cal.App.4th 1576, 1588.) All we have to do is substitute "collect taxes" for "charge rent" and the reasoning is just as valid.

Trades Council and the State Treasurer as amicus curiae labor mightily, and creatively, to convince us that an LIHTC qualifies as "the equivalent of money" within the meaning of subdivision (b)(1) or as "an asset of value" within the meaning of subdivision (b)(3). And they are persuasive that tax credits are an important mechanism for achieving objectives the Legislature deems in the public interest. But their undoubted importance and utility is not at issue here. Tax credits operate to reduce *future* tax liability, and cannot be used until the low-income project is built and operating. (26 U.S.C. § 42(f)(1); Cal. Code Regs., tit. 4, § 10328, subd. (a).) Further, any worth the credits may have is obviously predicated on the taxpayer having tax liabilities to offset. In other words, the worth of LIHTC's is, at the time they are allocated by the CTCAC, speculative and contingent upon future conditions.[16]

---

[16] Quoting *Gray v. Franchise Tax Board* (1991) 235 Cal.App.3d 36, 40 [286 Cal.Rptr. 453], the SBE Guidelines state that a tax credit provides "a dollar-for-dollar reduction in tax liability." (SBE Guidelines, *supra,* at p. 1, fn. 2.) There is reason to doubt the absolute accuracy of this zero-sum assessment. First, as already noted, the tax credit has utility as on offset only if the taxpayer has other liabilities to offset. Second, the LIHTC applies to most, but not all, tax liabilities; according to the State Treasurer: "The credits may be used to reduce the tax liability arising out of personal income taxes, bank or corporate taxes or insurance taxes . . . ." Finally, the idea of LIHTC's as seed money for desired economic development would clearly seem to indicate that the credits would have a ripple effect, that is, they would generate many kinds of taxable transactions or events that would inure to the state's financial benefit. The United States Supreme Court recently declined to see the fiscal impact of tax credits as entirely negative: "[I]t is unclear that tax breaks of the sort at issue here do in fact deplete the treasury: The very point of the tax benefits is to spur economic activity, which in turn *increases* government revenues." (*DaimlerChrysler Corp. v. Cuno* (2006) 547 U.S. 332, 344 [164 L.Ed.2d 589, 126 S.Ct. 1854].)

■ The United States Supreme Court has held that the mere receipt of a tax credit confers no economic benefit because the credits "have no value in themselves." (*Randall, supra,* 478 U.S. 647, 656–657.) We simply hold the converse—that in this context LIHTC's when allocated to a proposed project likewise entail no actual diminution of the state's economic resources. It bears emphasis that the operative event here is the allocation of LIHTC's to a project not yet completed. There is nothing in our record that shows allocation is anything more than a promise or an administrative assignment, the mere movement of figures from one column to another. Nothing tangible, such as certificates evidencing ownership of a property interest in the project, is transferred or delivered to the developer. Any movement of LIHTC's is purely abstract, a matter at best of bureaucratic bookkeeping. LIHTC's are not property. Allocated LIHTC's represent only the possibility of future benefit that may be realized after construction or rehabilitation of the proposed project. (See *Randall, supra,* 478 U.S. 647, 656–657; *Griffin, supra,* 324 F.3d 330, 355.) We therefore hold that they do not amount to either the "payment of money or the equivalent of money" within the scope of subdivision (b)(1)) or the transfer of "an asset of value for less than fair market value" within the scope of subdivision (b)(3).[17]

## IV

In the course of their diligent examination of section 1720, the parties and amici curiae comment upon a number of flaws, inconsistencies, and peculiarities in the statute. So have we.

[17] We do not find it obligatory to decide whether this type of transaction also involves "[c]onstruction . . . or repair work" that is "done under contract," the two other predicates specified in subdivision (a). In the trial court proceedings, Trades Council took it as a given that the proposed Woodhaven project "unquestionably involves 'construction' that is 'done under contract.' " Housing Development was equally emphatic the other way: "The State . . . does not enter into or 'award' a contract allowing tax credits. Nor . . . did the State put out to bid construction of the Woodhaven low-income housing project or enter into a contract for the construction of that project." The Director did not address either issue in his opposing papers. And in its order granting Trades Council's petition for the writ, the trial court did not consider whether allocation of LIHTC's by CTCAC amounted to a contract for construction or repair work. and neither issue was addressed by the trial court.

Although Housing Development does mention both issues in its opening brief, we see no need to pick up that invitation. Although it would appear that both issues could be considered here because they are purely legal and do not involve contested issues of fact, whether we elect to address them is a matter entrusted to our discretion. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 398, p. 450.) We decline to reach these issues because they have not been fully developed in the trial court papers or in the appellate briefs. Most significantly, they are not necessary for a decision here: if resolved favorably to the Director and Housing Development, they would simply be additional reasons for reversal; on the other hand, if resolved against the Director and Housing Development, reversal would still be required.

As previously noted, the first proposed amendment to section 1720 used the broadly inclusive approach of "includes but is not limited to" when framing the definition of "paid for in whole or in part out of public funds," but the final version employed the far more restrictive "means." This precludes us from reading subdivision (b) as reaching subjects not specified within it, or otherwise brought within subdivision (b) by provisions of section 1720. This conclusion follows from a principle of statutory construction best enunciated by Division One of this District: "The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." (*Rich v. State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512]; see *Arden Carmichael, Inc. v. County of Sacramento* (2001) 93 Cal.App.4th 507, 516 [113 Cal.Rptr.2d 248] [" 'every word excluded from a statute must be presumed to have been excluded for a purpose' "].) The Director asks us to reach the same result through application of the " ' "familiar rule of construction . . . that where a statute enumerates things upon which it is to operate it is to be construed as excluding from its effect all those not expressly mentioned." ' (*Capistrano Union High School Dist. v. Capistrano Beach Acreage Co.* (1961) 188 Cal.App.2d 612, 617 [10 Cal.Rptr. 750].)" We understand the logic of this argument, but we need not formally invoke it here because there are other prudential considerations that persuade us the language of section 1720 in its current form cannot be construed to reach LIHTC's.

Housing Development points out a number of specific statutes apart from section 1720 where the Legislature has expressly directed designated public works to comply with the prevailing wage law.[18] The implication is that by not ordering compliance with the prevailing wage law in the statutes establishing the LIHTC program, the Legislature has decided not to require that compliance. We do not think it unduly significant that the LIHTC program does not have a similar stand-alone directive in its enabling statutes, because such an approach would strip section 1720 of much of any independent utility, and threaten it with desuetude, if not extinction. On the other hand, the tenor of the argument is correct in drawing our attention to the undoubted ability of the Legislature to resolve any statutory doubt or ambiguity when it is so minded. And, we note, it is significant that section 1720 has no such expression, an omission even more striking because of the express reference to the LIHTC program in subdivision (d)(3). We are not authorized to rewrite

---

[18] Housing Development cites Fish and Game Code section 1350; Government Code sections 5956.8, 63036; Health and Safety Code sections 50675.4, 50898.2, 125290.65; Penal Code section 7010; Public Contract Code section 20672; Public Utilities Code section 3354; and Streets and Highways Code section 27189.

section 1720 to conform to an assumed intent the Legislature did not express. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 573 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *In re Hoddinott* (1996) 12 Cal.4th 992, 1002 [50 Cal.Rptr.2d 706, 911 P.2d 1381].)

Trades Council also insists that the Legislature significantly revised section 1720 in 2001 "in large part to overturn the *McIntosh* court's narrow construction of the word 'pay.' . . . [¶] . . . [¶] Under the current version of § 1720 (b), the word 'pay' has a broad meaning that reflects economic reality, not the narrow meaning used in *McIntosh*." This is true, but only up to a point. The Legislature clearly intended to broaden the scope of section 1720 from the way it read at the time *McIntosh* was decided (see fn. 9, *ante*), but the revision was not as significant as Trades Council imagines.

Trades Council points to subdivision (c)(5), where the Legislature categorically excluded one type of tax credit as demonstrating that there is no comparable exclusion for LIHTC's. And, so it argues, "If tax credits were not subsumed within the basic . . . § 1720 (b) definition, this exemption would have been wholly unnecessary. Hence, the adoption of this tax credit exemption at the same time that the coverage definition was expanded shows the Legislature intended the coverage definition to encompass [LIHTC's]." This may be valid as a point of abstract logic, but it collides with other parts of section 1720.

For one thing, if subdivision (c)(5) was meant to fulfill the function Trades Council assigns it, what is the intent behind subdivision (d)(3), which might be read as putting LIHTC's partly outside subdivision (b)? (We say "partly" because of the dateline established in subdivision (d)(3), a matter to which we will return.) If, as Trades Council argues, the effect of subdivision (c)(5) brings LIHTC's within the ambit of subdivision (b), and if the Legislature truly meant to include LIHTC's within the definition of "paid for in whole or in part out of public funds," why did it simply not say in a manner that would remove any doubt, by using the precise language it did in subdivision (d)(3)?

But, as already noted in part III, both subdivision (b)(1) and (3) speak to the state or political subdivision parting with a thing possessing current value. Subdivision (b)(1), "The payment of money or the equivalent of money by the state or political subdivision," and subdivision (b)(3), "Transfer by the state or political subdivision of an asset of value for less than fair market price," are couched in the present tense, and therefore would not ordinarily be thought to govern a future exchange or transfer. By contrast, such an intent

can be seen in subdivision (b)(5), where the Legislature placed within the definition "Money loaned by the state or political subdivision *that is to be repaid on a contingent basis.*" (Italics added.) As also noted, subdivision (b)(6) speaks to "Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision." And "repayment" in this context can hardly refer to a private contract where no moneys are advanced by the state, and thus nothing to be "repaid." If the Legislature had intended that LIHTC's be included with subdivision (b), one would naturally expect to see something like the language of subdivision (d)(3) in subdivision (b). That absence cannot be without meaning.

It may be true, as the Treasurer points out, that by granting LIHTC's the state accepts it will "forego" tax revenues which would otherwise be owed to the state. If the logic of this point is conceded, one would expect to see the point addressed in subdivision (b)(4)—which was obviously intended to abrogate part of our decision in *McIntosh*—and which brings within the definition of "paid for in whole or in part out of public funds" the following items of compensation that may be foregone: "Fees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than market value, waived, or forgiven by the state or political subdivision."

It could be argued, as is done here, that the prevailing wage law is in fact a disincentive to expanding the supply of low-income housing, and that, aware of this, the Legislature intended subdivisions (c)(4), (6), and (d) to remove that disincentive. Logically, however, one might expect the exemption to be categorical. Subdivision (c)(1) has that degree of certainty, and subdivision (c)(6) only slightly less. Based on this, the Director argues that it would have been anomalous for the Legislature to have granted immunity for some types of low-income housing projects, but not for ones using LIHTC's. While it is not beyond the realm of possibility, or power, that the Legislature could adopt differing approaches to a matter as large and important as low-income housing, we would not adopt that conclusion without trepidation. If there is a logical line of division, we cannot discern it. The matter is further complicated by the peculiar nature of subdivision (d).

Mention has already been made of the unusual language in subdivision (d). It directs that "residential rental projects," "[s]ingle-family residential projects," and "[l]ow-income housing projects" financed with bonds, mortgage certificates, or LIHTC's in accordance with specified federal and state statutes "on or before December 31, 2003," "shall not, solely by reason of [section 1720], be subject to" the prevailing wage law. (§ 1720, subd. (d).) This, Trades Council argues, shows a legislative compromise not to apply the

prevailing wage law to projects that had already started or were imminently to be started so as not to jeopardize projects already financed on the assumption that prevailing wages would not have to be paid. While this is, as the trial court noted, a plausible explanation,[19] there are difficulties with it.

For one thing, if projects commenced before December 31, 2003, are to be treated as exempt from the prevailing wage law "solely" because LIHTC's have been allocated, it might logically follow that a different rule was intended for projects commenced after that date? More specifically, does it mean that projects begun after January 1, 2004, do not enjoy a like exemption? Such a clear chronological delineation naturally suggests a distinction of some sort, and what is a more logical distinction than a not covered/covered dichotomy?

This is how Trades Council views the matter, noting that "it would be strange for the Legislature to focus on exempting LIHTC-funded projects for a limited time if LIHTCs themselves did not trigger prevailing wage coverage." The Director responds that "The effect of the expiration of the sunset date is not that LIHTCs became payment out of public funds, but rather that after that date, each source of funding for a project has to be examined against the definition in section 1720 (b). In other words, a project allocated LIHTCs after December 31, 2003, may be subject to prevailing wage requirements if it receives other forms of financial assistance that are enumerated by section 1720 (b)."

Neither of these arguments is completely satisfying. The problem with the Director's position is that it simply begs the question of whether, after January 1, 2004, LIHTC's are covered by the definitional provisions of subdivision (b), which is where we came in. It begs the additional question of why, if this was its intent, the Legislature did not simply use language comparable to the permanent exclusion it established for a different tax credit program in subdivision (c)(5)? Here again, the difficulty with acceding to the arguments of Housing Development and the Director is that the very precision used for subdivision (c)(5) cautions against implying that level of precision with respect to LIHTC's. (See *Brown, supra*, 48 Cal.3d 711, 725.) As one Court of Appeal noted in a different statutory context, "The Legislature knows how to speak the language and they used it." (*People v. Palomar* (1985) 171 Cal.App.3d 131, 134 [214 Cal.Rptr. 785].) But not in subdivision (b).

---

[19] It is possible to view subdivision (d)(3) as in the nature of a "grandfather clause" or as establishing a grace period of deferred operation. (See *Regents of UNM v. Federation of Teachers* (1998) 1998 NMSC 20 [125 N.M. 401, 962 P.2d 1236]; *Parker v. Continental Casualty Co.* (1963) 191 Kan. 674 [383 P.2d 937]; *Osborn v. Charlevoix Circuit Judge* (1897) 114 Mich. 655 [72 N.W. 982]; 2A Singer & Singer, Sutherland Statutes and Statutory Construction, *supra*, § 33.8, pp. 24–25.)

The difficulty with the way in which Trades Council reads subdivision (d)(3) is simply one of proportionality. To accept it, we must accept that the fact that the Legislature in effect made subdivision (d)(3) an oblique way of introducing LIHTC's allocated after January 1, 2004, into the general definition of "paid for in whole or in part out of public funds." We would need much stronger proof that the Legislature played such a sleight-of-hand game.

■ Courts do not lightly conclude that substantial statutory changes are intended or accomplished by legislative misdirection. At the federal level, the United States Supreme Court has observed that " 'Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.' *Whitman* v. *American Trucking Assns.* 531 U. S. 457, 468 [149 L.Ed.2d 1, 121 S.Ct. 903] (2001); see *FDA* v. *Brown & Williamson Tobacco Corp.* 529 U. S. 120, 160 [146 L.Ed.2d 121, 120 S.Ct. 1291] (2000) ('[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance . . . in so cryptic a fashion')." (*Gonzales v. Oregon* (2006) 546 U.S. 243, 267 [163 L.Ed.2d 748, 126 S.Ct. 904].) California courts have adopted a similar skepticism. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482 [66 Cal.Rptr.2d 319, 940 P.2d 906]; *In re Christian S.* (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 589 [48 Cal.Rptr.3d 340]; *Pleasant Hill Bayshore Disposal, Inc. v. Chip-It Recycling, Inc.* (2001) 91 Cal.App.4th 678, 690, fn. 7 [110 Cal.Rptr.2d 708].) Thus, we cannot view subdivision (d)(3) as a shoehorn for inserting LIHTC's into subdivision (b).

The preceding discussion has shown that existing law prior to the 2001 amendments to section 1720 did not treat tax credits as tangible property akin to expenditure of public funds. That consensus has only increased since then. We do not believe that the Legislature's insertion of the generic term "credits" into subdivision (b) meant to diverge from this widespread agreement.[20] This conclusion is only fortified by consulting subdivision (c), where the Legislature made explicit reference to a specific type of tax credit, and subdivision (d)(3), where it made a highly opaque reference to the LIHTC program. We cannot treat all of these differing references as synonyms. (*People v. Nguyen, supra,* 21 Cal.4th 197, 205; *Brown, supra,* 48 Cal.3d 711, 725.) If there are blanks or gaps in section 1720, it is not for us to fill them. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra,* 17 Cal.4th 553, 573, *In re Hoddinott, supra,* 12 Cal.4th 992, 1002.)

---

[20] The particular part of subdivision (b)—"Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision"—is particularly unhelpful to a theory of incorporation by reference because no one argues that money owed to the state by the developer is being repaid by an allocation of LIHTC's.

## CONCLUSION AND DISPOSITION

California courts accept that tax credits are, for all practical intents, "a matter of legislative grace," which the Legislature "may grant or deny . . . in any manner it sees fit, . . . and the scope, application, and terms of eligibility are entirely for the Legislature to establish." (*General Motors Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 773, 790 [47 Cal.Rptr.3d 233, 139 P.3d 1183].) The Legislature has decided to join with the federal government to enlarge the stock of low-income housing by using LIHTC's as an inducement for private parties to help achieve what is deemed to be in the public good. But did the Legislature when it amended section 1720 intend that LIHTC's were to be used as one of the instruments for expanding the ambit of the prevailing wage law?

■ There are weighty arguments and worthy goals arrayed on each side. Trades Council and the State Treasurer, citing the rule of liberal construction traditionally afforded the prevailing wage law (*City of Long Beach, supra,* 34 Cal.4th 942, 949–950; *McIntosh, supra,* 14 Cal.App.4th 1576, 1589), see the issue as the threatened frustration of the clear statutory mandate to apply the prevailing wage law to a category of residential construction that would not exist but for the gift of LIHTC's. The Director, Housing Development, the Building Industry Association, and the Redevelopment Association are eloquent in describing what they perceive will be the adverse impact of extending the prevailing wage law to future projects, thereby reducing the willingness of developers to expand the stock of low-income housing. These are issues of high public policy. To choose between them, or to strike a balance between them, is the essential function of the Legislature, not a court. "Our role is confined to ascertaining what the Legislature has actually done, not assaying whether sound policy might support a different rule." (*General Motors Corp. v. Franchise Tax Bd., supra,* 39 Cal.4th 773, 790.)

■ The rule of liberal construction is subject to an important proviso: " 'Courts will liberally construe prevailing wage statutes [citations], but they cannot interfere where the Legislature has demonstrated the ability to make its intent clear and chosen not to act [citation].' " (*City of Long Beach, supra,* 34 Cal.4th 942, 950, quoting *McIntosh, supra,* 14 Cal.App.4th 1576, 1589; accord, *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 50 [276 Cal.Rptr. 114, 801 P.2d 357].) Ultimately, this is how we deal with section 1720. ■ Subdivision (c)(5) demonstrates that the Legislature knew how to craft a categorical exemption for a project connected to a statutory tax credit. Subdivision (d)(3) demonstrates that the Legislature knew about, and knew how to address, the LIHTC programs at issue here. The fact that it did not do so tips the scales.

The purported appeals from the writ of mandate are dismissed. The order granting the petition for a writ of mandate is reversed, and the cause is remanded to the trial court with directions to (1) recall the writ of mandate; (2) set aside the order granting the petition; and (3) enter a new order denying the petition. Appellants shall recover their costs on appeal.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied May 16, 2008, and the opinion was modified to read as printed above.

## APPENDIX

## Labor Code Section 1720

(a) As used in this chapter, "public works" means:

(1) Construction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority. For purposes of this paragraph, "construction" includes work performed during the design and preconstruction phases of construction, including, but not limited to, inspection and land surveying work.

(2) Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. "Public work" does not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages.

(3) Street, sewer, or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not.

(4) The laying of carpet done under a building lease-maintenance contract and paid for out of public funds.

(5) The laying of carpet in a public building done under contract and paid for in whole or in part out of public funds.

(6) Public transportation demonstration projects authorized pursuant to Section 143 of the Streets and Highway Code.

(b) For purposes of this section, "paid for in whole or in part out of public funds" means all of the following:

(1) The payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer.

(2) Performance of construction work by the state or political subdivision in execution of the project.

(3) Transfer by the state or political subdivision of an asset of value for less than fair market price.

(4) Fees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision.

(5) Money loaned by the state or political subdivision that is to be repaid on a contingent basis.

(6) Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision.

(c) Notwithstanding subdivision (b):

(1) Private residential projects built on private property are not subject to the requirements of this chapter unless the projects are built pursuant to an agreement with a state agency, redevelopment agency, or local public housing authority.

(2) If the state or political subdivision requires a private developer to perform construction, alteration, demolition, installation, or repair work on a public work of improvement as a condition of regulatory approval of an otherwise private development project, and the state or political subdivision contributes no more money, or the equivalent of money, to the overall project than is required to perform this public improvement work, and the state or political subdivision maintains no proprietary interest in the overall project, then only the public improvement work shall thereby become subject to this chapter.

(3) If the state or political subdivision reimburses a private developer for costs that would normally be borne by the public, or provides directly or indirectly a public subsidy to a private development project that is de minimis in the context of the project, an otherwise private development project shall not thereby become subject to the requirements of this chapter.

(4) The construction or rehabilitation of affordable housing units for low- or moderate-income persons pursuant to paragraph (5) or (7) of subdivision (e) of Section 33334.2 of the Health and Safety Code that are paid for solely with moneys from a Low and Moderate Income Housing Fund established pursuant to Section 33334.3 of the Health and Safety Code or that are paid for by a combination of private funds and funds available pursuant to

Section 33334.2 or 33334.3 of the Health and Safety Code do not constitute a project that is paid for in whole or in part out of public funds.

(5) "Paid for in whole or in part out of public funds" does not include tax credits pursuant to Section 17053.49 or 23649 of the Revenue and Taxation Code.

(6) Unless otherwise required by a public funding program, the construction or rehabilitation of privately owned residential projects is not subject to the requirements of this chapter if one or more of the following conditions are met:

(A) The project is a self-help housing project in which no fewer than 500 hours of construction work associated with the homes are to be performed by the homebuyers.

(B) The project consists of rehabilitation or expansion work associated with a facility operated on a not-for-profit basis as temporary or transitional housing for homeless persons with a total project cost of less than twenty-five thousand dollars ($25,000).

(C) Assistance is provided to a household as either mortgage assistance, downpayment assistance, or for the rehabilitation of a single-family home.

(D) The project consists of new construction, or expansion, or rehabilitation work associated with a facility developed by a nonprofit organization to be operated on a not-for-profit basis to provide emergency or transitional shelter and ancillary services and assistance to homeless adults and children. The nonprofit organization operating the project shall provide, at no profit, not less than 50 percent of the total project cost from nonpublic sources, excluding real property that is transferred or leased. Total project cost includes the value of donated labor, materials, architectural, and engineering services.

(E) The public participation in the project would otherwise meet the criteria of subdivision (b) is public funding in the form of below-market interest rate loans for a project in which occupancy of at least 40 percent of the units is reserved for at least 20 years, by deed or regulatory agreement, to individuals or families earning no more than 80 percent of the area median income.

(d) Notwithstanding any provision of this section to the contrary, the following projects shall not, solely by reason of this section, be subject to the requirements of this chapter:

(1) Qualified residential rental projects, as defined by Section 142 (d) of the Internal Revenue Code, financed in whole or in part through the issuance of bonds that receive allocation of a portion of the state ceiling pursuant to Chapter 11.8 of Division 1 (commencing with Section 8869.80) of the Government Code on or before December 31, 2003.

(2) Single-family residential projects financed in whole or in part through the issuance of qualified mortgage revenue bonds or qualified veterans' mortgage bonds, as defined by Section 143 of the Internal Revenue Code, or with mortgage credit certificates under a Qualified Mortgage Credit Certificate Program, as defined by Section 25 of the Internal Revenue Code, that receive allocation of a portion of the state ceiling pursuant to Chapter 11.8 of Division 1 (commencing with Section 8869.80) of the Government Code on or before December 31, 2003.

(3) Low income housing projects that are allocated federal or state low-income housing tax credits pursuant to Section 42 of the Internal Revenue Code, Chapter 3.6 of Division 31 (commencing with Section 50199.4) of the Health and Safety Code, or Section 12206, 17058, or 23610.5 of the Revenue and Taxation Code, on or before December 31, 2003.

(e) If a statute, other than this section, or a regulation, other than a regulation adopted pursuant to this section, or an ordinance or a contract applies this chapter to a project, the exclusions set forth in subdivision (d) do not apply to that project.

(f) For purposes of this section, references to the Internal Revenue Code mean the Internal Revenue of 1986, as amended, and include the corresponding predecessor sections of the Internal Revenue Code of 1954, as amended.

(g) The amendments made to this section by either Chapter 938 of the Statutes of 2001 or the act adding this subdivision[*] shall not be construed to preempt local ordinances requiring the payment of prevailing wages on housing projects.

---

[*]Statutes 2002, chapter 1048, section 1.