Filed 10/21/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ATHLETICS INVESTMENT GROUP LLC,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al.,<br><br>    Defendants;<br><br>SCHNITZER STEEL INDUSTRIES, INC.,<br><br>    Real Party in Interest and Appellant. | A162524<br><br>(Alameda County<br>Super. Ct. No. RG200069917)<br><br>**ORDER MODIFYING OPINION; AND DENYING PETITION FOR REHEARING AND REQUEST FOR JUDICIAL NOTICE**<br>    **[NO CHANGE IN JUDGMENT]** |

**THE COURT\*:**

It is ordered that the opinion filed herein on September 30, 2022, be modified in the following particulars:

1. On page 2, line 20, in the sentence beginning "But the same legislatively mandated study," the word "draft" is inserted after the word "mandated" and before the word "study."

2. On page 2, lines 22-23, and page 3, line 1, the sentence beginning "There is no threat" is deleted and replaced with the following sentence: "There is no threat to human health or the environment inherent in

---

    \* Tucher, P.J., Fujisaki, J., and Rodríguez, J. participated in the decision.

1

managing *treated* metal-shredder waste as nonhazardous, the Department found."

3. On page 3, line 27, and page 4, lines 1-2, the following sentence is deleted: "This disposal of treated metal-shredder waste has caused no known environmental problems, as we discuss further below."  The deleted text is replaced with the following sentence:  "This disposal of treated metal-shredder waste generally does not cause environmental problems, as we discuss further below."

4. On page 21, lines 18-21, the second to last sentence of the paragraph, which begins "Although the Athletics," and the last sentence of the paragraph, which begins "Science supports," are deleted.  The deleted text is replaced with the following sentence:  "Although the Athletics choose to ignore this finding, it supports the Department's decision not to immediately rescind the (f) letters."

5. On page 23, in the sentence on lines 7-11 that begins "Our construction of the statute requires the Department to abandon what," the words "it has acknowledged" are inserted after the word "what."

These modifications do not effect a change in the judgment.

On October 17, 2022, appellant filed a petition for rehearing, and the court received but did not file appellant's accompanying request for judicial notice.  The clerk of the court is ordered to file the request for judicial notice, and both the petition for rehearing and the request for judicial notice are denied.


Dated:__October 21, 2022___                      ____TUCHER, P.J._____ P.J.


*The Athletics Investment Group, LLC v. California Department of Toxic Substances Control et al* (A162524)

Trial Court:  Alameda County Superior Court

Trial Judge:  Hon. Paul D. Herbert

Counsel:  Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk, Margaret Rosegay, Stacey C. Wright, Mark E. Elliott, and Kevin Murray Fong for Real Party in Interest and Appellant

Glynn, Finley, Morti, Hanlon & Friedenberg, Andrew T. Morti, James M. Hanlon, Jr. for SA Recycling, LLC, as Amicus Curiae on behalf of Real Party in Interest and Appellant

Keker, Van Nest & Peters, R. James Slaughter, and Eric H. MacMichael; Venable, William M. Sloan, and Tyler G. Welti for Petitioner and Respondent

Lauren P. Phillips, and Jaclyn H. Prange for Communities for a Better Environment, the Center on Race, Poverty & the Environment, San Francisco Baykeeper, the Sierra Club and the Natural Resources Defense Council, as Amicus Curiae on behalf of Petitioner and Respondent

Rob Bonta, Attorney General of California, Dennis L. Beck, Jr., Supervising Deputy Attorney General, Elizabeth B. Rumsey, Deputy Attorney General for Defendant

3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ATHLETICS INVESTMENT GROUP LLC, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., <br><br>     Defendants; <br><br> SCHNITZER STEEL INDUSTRIES, INC., <br><br>     Real Party in Interest and Appellant. | A162524 <br><br><br> (Alameda County <br> Super. Ct. No. RG20069917) |

For almost 60 years, Schnitzer Steel Industries, Inc. (Schnitzer) has operated a scrap-metal shredding and recycling facility near the Port of Oakland, where it converts junked automobiles, appliances, and other scrap metal into streams of recyclable materials and nonrecyclable waste. When the Department of Toxic Substances Control (Department) first acquired regulatory authority over metal-shredding facilities in the 1980s, it regulated with a light touch in part by issuing Schnitzer a certification pursuant to subdivision (f) of California Code of Regulations, title 22, section 66260.200

1

(an (f) letter).[2]  An (f) letter is a conditional nonhazardous waste classification, allowing Schnitzer to handle and dispose of its treated metal-shredder waste as nonhazardous although the material otherwise meets the state's definition of hazardous waste.  (See Regs., § 66260.200, subd. (f).)

In 2014, the Legislature added to the Hazardous Waste Control Law (Health & Saf. Code, § 25100 et seq. (HWCL)) a new section 25150.82, specifically addressing metal-shredding facilities.  The question now before the court is whether section 25150.82 imposes a mandatory duty on the Department to rescind the (f) letters, such that Schnitzer must handle and dispose of its treated metal-shredder waste as hazardous.  The trial court answered this question in the affirmative and granted the petition for writ of mandate sought by the Athletics Investment Group, LLC (Athletics).  We reach the opposite conclusion and reverse.

In adopting section 25150.82, the Legislature effectively prodded the Department to study and address environmental problems associated with metal shredding.  As a result of the legislatively-mandated study, the Department initiated regulatory actions aimed at metal-shredding facilities and their untreated waste.  Those efforts are not at issue here, and nothing we say should be read as detracting from them.  Metal shredders must comply with the HWCL in full.  But the same legislatively-mandated study also confirmed that once metal-shredding waste has been appropriately treated, it can be safely handled and disposed of as nonhazardous.  There is no threat to human health or the environment from managing *treated* metal-

---

[2] References to the Department include its predecessor agency. Undesignated statutory references are to the Health and Safety Code, and undesignated references to regulations are to title 22 of the California Code of Regulations (e.g., Regs., § 66260.200).  The Department issued Schnitzer two (f) letters, to which we refer using the singular and plural.

shredder waste as nonhazardous.  Schnitzer's (f) letter authorizing this practice was issued pursuant to an HWCL regulation, and the record reveals no basis for concluding it does not still comply with the HWCL.  Thus, on this record section 25150.82 does not impose a mandatory duty on the Department to rescind Schnitzer's (f) letter.

## BACKGROUND

### A.  Metal-Shredder Waste

Schnitzer has shredded and recycled tens of millions of tons of scrap metal over the years.  Its shredding and recycling process extracts and separates, from the arriving stream of junked cars and other waste, ferrous and nonferrous metals and other recyclable materials.  What remains after recyclables are removed is a mix of metal, plastic, rubber, glass, foam, fabric, carpet, wood, residual automobile fluid, dirt, and other debris.  This residue contains lead, cadmium, copper, zinc and polychlorinated biphenyls (PCBs) at levels exceeding California's hazardous waste thresholds.  Schnitzer treats the residue by mixing it with silicates, water, and cement and then curing it.  This treated waste still exceeds hazardous thresholds for zinc, lead, and copper, but the process of chemical stabilization reduces the mobility of the heavy metals in the treated waste, leading the Department to classify the material as nonhazardous and issue an (f) letter.

The chemically-treated metal-shredder residue, also called treated metal-shredder waste, is then transported to landfills for disposal.  Schnitzer trucks its treated metal-shredder waste to ordinary municipal landfills, where the material is used as alternative daily cover, meaning it is applied to the active face of the landfill to control fires, odors, blowing litter, and so on.  Treated metal-shredder waste from Schnitzer and other metal shredders has provided some half a million tons of alternative daily cover annually.  This

3

disposal of treated metal-shredder waste has caused no known environmental problems, as we discuss further below.

**B. The Evolving Regulatory Framework**

The Department "is the state agency responsible for ensuring that California's public health and environment are protected from the effects of hazardous substances." (*City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 346, fn. 7.) Consistent with this mandate, the Department is charged with enforcing California's HWCL and its implementing regulations. (*IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 91.)

The HWCL governs facilities that generate, process, treat, or store hazardous waste, which the statute defines as waste posing a "substantial present or potential hazard to human health or the environment, due to factors including, but not limited to, carcinogenicity, acute toxicity, chronic toxicity, bioaccumulative properties, or persistence in the environment, when improperly treated, stored, transported, or disposed of, or otherwise managed." (§§ 25141, subd. (b)(2), 25124, 25117; Regs., § 66261.2, subd. (a) [defining waste].) The HWCL defines hazardous waste more strictly than does the federal Resource Conservation and Recovery Act (RCRA).

The Department's regulations implement the HWCL, first by defining hazardous waste (Regs., § 66261.3), then by requiring all persons who manage such waste to comply with hazardous waste management regulations, "except as provided for in section 66260.200(f)." (Regs., § 66260.200, subd. (b).) Regulations section 66260.200, subdivision (f) states: "If a person wishes to classify and manage as nonhazardous a waste which would otherwise be a non-RCRA hazardous waste because it has mitigating physical or chemical characteristics which render it insignificant as a hazard to human health and safety, livestock and wildlife, that person shall apply to

4

the Department for its approval to classify and manage the waste as nonhazardous. . . .” The regulation spells out the information required in an application, which includes a description of the waste and of the sampling, laboratory testing, and results of prescribed studies of the waste. (Regs., § 66260.200, subd. (m).)

None of these statutory provisions or regulations specifically addresses the metal-shredding industry, but they do set standards that encompass the activities of metal shredders. In 1984, the Department informed metal shredders that their waste management practices must comply with the HWCL. The Department then began working with a shredder in Los Angeles to determine whether the now-accepted process of treating the waste with silicate and cement would qualify it as nonhazardous. Concluding that, indeed, the " 'mitigating physical or chemical characteristics' " of treated metal-shredder waste "render it insignificant as a hazard to human health and safety" or to animals, the Department issued (f) letters to several metal shredders, including Schnitzer. Schnitzer's (f) letter reviews the results of laboratory analyses Schnitzer submitted to the Department and concludes its treated waste is properly "classified as a nonhazardous waste." The letter directs that if Schnitzer's "waste changes to the extent that the Department's determination can no longer be supported by the information submitted," Schnitzer must begin managing its treated waste as hazardous.

The (f) letters only classify metal-shredder waste as nonhazardous once it has undergone chemical treatment, but a separate regulatory decision the Department made in the 1980s substantially broadened the effect of the (f) letters. In 1988, the Department issued Official Policy and Procedure Number 88-6 (OPP 88-6) governing activities at metal-shredder facilities. This document concluded that if the chemical stabilization process was

5

performed as part of the process of separating out recyclable metals, the process would be considered "in-line" and the flow of materials within the metal-shredding facility would be considered not yet a "waste," and therefore not a hazardous waste. This policy meant that even though metal-shredder facilities were treating, storing, and handling an intermediate stream of waste that was hazardous because not yet chemically treated, they were not required to obtain hazardous waste permits as long as the waste was nonhazardous by the time it left the facility, chemically treated. For years, Schnitzer left untreated metal-shredder waste in piles on its property, outside and uncovered, where it could leach into the soil and groundwater, blow offsite, or catch fire. But because the (f) letter classified Schnitzer's *treated* metal waste as nonhazardous, OPP 88-6 allowed Schnitzer to handle its *untreated* metal waste as nonhazardous, although it was not.

By 2001, the Department had concluded its policy on metal-shredder waste was "outdated and legally incorrect." A new analysis by its Office of Legal Counsel determined that a crushed automobile becomes a hazardous waste as soon as it has been shredded, so any activity after that point—both resource recovery and treatment to render resulting waste streams nonhazardous—requires a permit or other authorization from the Department. The Department's legal analysis expressly repudiated OPP 88-6's "not yet a waste" rationale, and observed that OPP 88-6 also relied on a since-repealed statute.

In 2008, the Department advised Schnitzer it intended to rescind OPP 88-6 and the (f) letters to "ensure the safety of public health and the environment from harmful exposures [to] toxins." In 2007, there had been an explosion at a metal-shredder facility on Terminal Island, resulting in the release of hazardous waste. But after industry representatives responded

6

with technical information in support of their processes and legal arguments challenging the Department's proposal, the rescission was never finalized.

Problems continued at metal-shredding facilities. For example, in 2012 the Department identified releases of light fibrous material (a form of shredder waste not yet chemically stabilized) from a metal shredder in Redwood City. In 2013, a series of fires at the same facility resulted in shelter-in-place orders for the nearby community. Then in 2014, the state Senator who represented this community, Senator Jerry Hill, introduced Senate Bill No. 1249. (Stats. 2014, ch. 756.)

**C. The Metal-Shredding Facilities Law (Section 25150.82)**

When the Legislature passed Senate Bill No. 1249, it added section 25150.82 to the HWCL to address metal-shredding facilities. (Stats. 2014, ch. 756, § 3; Sen. Bill No. 1249.)

Section 25150.82 authorizes the Department to adopt "alternative management standards" specific to the metal-shredding industry. (§ 25150.82, subd. (c).) The statute sets forth a process for adopting such standards, requiring the Department to prepare a preliminary analysis and, following public comment, a final analysis of the activities to which the alternative management standards would apply. (§ 25150.82, subds. (c) & (d).) The statute sets a high bar that any alternative management standards must meet; generally, they must be as protective "of human health and safety and the environment" as the HWCL standards they would replace, and neither duplicate nor conflict with other law. (§ 25150.82, subds. (e), (f) & (g).) Consistent with this directive, alternative management standards may "allow for treated metal shredder waste to be classified and managed as nonhazardous waste" only if the analysis prescribed by the statute

7

demonstrates that classifying and managing the material as hazardous is unnecessary to protect humans or the environment. (§ 25150.82, subd. (i).)

Section 25150.82 sets forth a timeline for action. "The department shall complete the analysis described in . . . subdivision (c) and subsequent regulatory action before January 1, 2018." (§ 25150.82, subd. (k).) On that date, the entire regulatory regime governing metal-shredder waste *could be* transformed. "All hazardous waste classifications and policies . . . issued by the department before January 1, 2014" relating to "metal shredder waste shall be inoperative and have no further effect on January 1, 2018, *if* the department completes its analysis pursuant to subdivision (c) and takes one of the following actions: [¶] (1) Rescinds the [(f) letters]. [¶] (2) Adopts alternative management standards pursuant to this section." (*Ibid*., italics added.) However, if the Department does not adopt alternative management standards by January 1, 2018, the authorization in the statute to do so expires. (§ 25150.82, subd. (l).)

Section 25150.82 authorizes the Department to adopt alternative management standards, but it does not require them. If the department does not adopt alternative management standards, it must regulate metal-shredder waste according to the HWCL, rather than, say, relying on a policy it knows to be contrary to law. "The disposal of treated metal shredder waste shall be regulated pursuant to this chapter [i.e., the HWCL] and the regulations adopted pursuant to this chapter, unless alternative management standards are adopted . . . ," commands subdivision (j)(1) of section 25150.82. Finally, the statute provides a safe harbor for the ongoing use of treated metal-shredder waste as alternative daily cover, allowing this use at an appropriate disposal site unless and until the department "[r]escinds, in

8

accordance with applicable law, the [(f) letters]" or "[c]ompletes the adoption of alternative management standards." (§ 25150.82, subd. (j)(3).)

The Department did not promulgate alternative management standards by the statutory deadline. Instead, it issued a draft report in January 2018 that concluded, "the risks and hazards posed by the hazardous waste management activities conducted at metal shredding facilities require the protections that can only be provided by the existing hazardous waste management requirements." To protect the communities where these shredder facilities were located, the Department resolved to require hazardous waste permits; it chose not to adopt alternative management standards.

The same draft report also examined the disposal of treated metal-shredder waste in landfills. Evaluating "the potential for migration of the waste through air dispersion, surface water runoff, and leaching into groundwater," the Department found no evidence of such migration in the landfills that had been accepting treated metal-shredder waste for decades. The Department also considered the transportation of treated metal-shredder waste from shredder facilities to landfills. It concluded trucks carrying treated metal-shredder waste must be covered during transport, but noted that Vehicle Code section 23114 already requires drivers to prevent the contents of their trucks from dropping, blowing, or otherwise escaping. The Department therefore concluded that classifying *treated* metal-shredder waste "as a hazardous waste is not necessary to prevent or mitigate potential hazards to human health or safety or to the environment." Consistent with this conclusion, the draft report announced the Department's intention "to

9

promulgate regulations that exclude [treated metal-shredder waste] from classification as a hazardous waste under separate statutory authority."[3]

A few months after completing its draft report, the Department began implementing this new regulatory process. It issued, in June 2018, a " 'Public Workshop Notice' " eliciting the public's views as the Department set about replacing the (f) letters with "a new regulation that places additional specified requirements as conditions" on the management of treated metal-shredder waste as nonhazardous. But the Department's regulatory process was slow and, in the meantime, the Department left Schnitzer's (f) letter in place. This litigation ensued.

**D. This Litigation**

The Athletics—owner of the Oakland Athletics baseball team—maintains its business operations near Schnitzer's metal-shredding facility in West Oakland "and is in the process of seeking approvals to build a ballpark for Major League Baseball games and other events in close proximity to" Schnitzer's facility. In August 2020, the Athletics petitioned for a writ of mandate, pursuant to Code of Civil Procedure section 1085, to compel the Department "(i) to rescind Schnitzer's 'f letter' and (ii) to require Schnitzer to operate [its facility] in compliance with the HWCL."

In its verified petition, the Athletics detail environmental harm resulting from Schnitzer's activities in West Oakland. The petition alleges that Schnitzer has contaminated soil and groundwater at its metal-shredding

---

[3] "[U]nder separate statutory authority" acknowledges that, although subdivision (i) of section 25150.82 permitted alternative management standards to classify and manage treated metal shredder waste as nonhazardous, the Department had decided not to adopt such standards. Other statutory authority authorizes the Department more generally to adopt regulations implementing the HWCL. (See, e.g., §§ 25141, 25150.)

facility; that contaminated groundwater there has polluted the San Francisco Bay; and that Schnitzer's "shredding, stockpiling, processing, and treatment of" intermediate waste streams has caused hazardous material to be blown offsite, so that large amounts of "fugitive dust" and " 'light fibrous material' " contaminated with "high concentrations of lead, copper, and zinc" have been "deposited directly into the Oakland Inner Harbor" and "across a broad swath of West Oakland." The petition also alleges numerous fires have occurred in the stockpiles at Schnitzer's facility, emitting toxic smoke and raising public health concerns. The neighborhood is "a largely African-American, low-income community with a long history of suffering environmental pollution," the petition explains; 23,000 residents live within a mile of Schnitzer's facility.

The petition also recounts a history of the Department's action—and inaction—in regulating the activities of metal shredders. It mentions the Department's decision, explained in the January 2018 report, not to adopt alternative management standards pursuant to Senate Bill No. 1249. And the petition argues that the Department has failed to comply with section 25150.82, in that it has *also* not rescinded Schnitzer's (f) letter and "begun regulating metal shredders under the HWCL." The Athletics read section 25150.82 as imposing a nondiscretionary duty on the Department, if it has not adopted alternative management standards by January 1, 2018, to "regulate metal shredders pursuant to the HWCL and rescind the 'f letters.' "

Schnitzer and the Department each demurred to the petition, arguing section 25150.82 imposes no mandatory duty on the Department to rescind Schnitzer's (f) letter in the absence of alternative management standards. Addressing the less specific relief sought—that the Department be compelled to require " 'compliance with the HWCL' " at Schnitzer's facility—the

11

Department points out that the Athletics allege no mandatory duty other than to rescind the (f) letters, and that mandamus will not lie to direct the Department's exercise of regulatory discretion. (Citing *California Teachers Assn. v. Ingwerson* (1996) 46 Cal.App.4th 860, 865.) The Athletics, in turn, moved for judgment on the petition. The trial court overruled the demurrers and granted the petition for writ of mandate.

The trial court agreed with the Athletics' reading of section 25150.82. In light of the undisputed fact that the Department had not adopted alternative management standards by January 1, 2018, the trial court concluded that the statute imposed a mandatory duty on the Department to rescind Schnitzer's (f) letter and regulate its treated metal-shredder waste under the HCWL. The court grounded this conclusion in what it called the "plain language" of subdivision (j)(1) of section 25150.82, that " '[t]he disposal of treated metal shredder waste *shall* be regulated pursuant to' " the HWCL and its regulations " 'unless alternative management standards are adopted by the department pursuant to this section.' " The court reasoned that without alternative management standards, subdivision (j)(1) required the Department "to regulate Schnitzer by applying the HWCL, not . . . by leaving in place the 'f letter' that exempts Schnitzer's metal shredder waste from regulation under the HWCL."

The trial court found additional support for its statutory interpretation in two places. First, it cited the mandatory language of the first sentence of section 25150.82, subdivision (k), requiring the department to complete its analysis " 'and subsequent regulatory action before January 1, 2018.' " Second, it cited extrinsic aids, including a declaration of legislative intent memorialized in an uncodified portion of the statute, " 'that the conditional nonhazardous waste classifications, as documented through the historical "f

12

letters," be revoked and that metal shredding facilities be thoroughly evaluated and regulated to ensure adequate protection of the human health and the environment.' " (Stats. 2014, ch. 756, § 1(f).)

On April 16, 2021, the trial court issued a judgment and writ of mandate commanding the Department to rescind Schnitzer's (f) letter and regulate the metal-shredder waste under the HWCL. The writ ordered compliance within 30 days and directed the Department to file a return evincing such compliance. Schnitzer appealed; the Department did not. The trial court granted the Athletics' motion to lift the automatic stay pending appeal. (See Code Civ. Proc., § 1110b). Schnitzer petitioned for a writ of supersedeas, which we denied.

With the stay lifted, the Department complied with the writ by rescinding Schnitzer's (f) letter on November 29, 2021.[4] The Department did not rescind the other (f) letters under which five metal shredders in the state were operating. However, a few weeks before the stay was lifted, the Department did rescind OPP 88-6, having finalized its 2018 draft report and concluded OPP 88-6 was contrary to law. The Department also sent " 'Call-In Letters' " to Schnitzer and eight other metal-shredding facilities notifying them of the need to apply for hazardous waste facility permits. The Department also adopted an emergency regulation of the sort recommended

---

[4] The order lifting the stay is the subject of a separate appeal (*The Athletics Investment Group, LLC v. California Department of Toxic Substances Control et al.* (A163291, app. pending)). Except as noted in footnote 4, the facts in this paragraph are drawn from the Department's Return to the Verified Petition for Writ of Mandate, filed in the trial court on December 14, 2021. We grant Schnitzer's unopposed request for judicial notice of the return (Evid. Code, §§ 452, subd. (c), 459, subd. (a)), but do not rely on these facts in resolving the legal issue before us, as they were not before the trial court when it issued the writ.

in its January 2018 draft report, excluding the transportation and disposal of treated metal-shredder waste from regulation as hazardous waste if certain conditions were met. (See Regs., § 66261.4, former subd. (b)(6).) The Athletics challenged the emergency regulation as a violation of the writ of mandate issued in this case, which persuades us the current appeal is not moot even though Schnitzer's (f) letter has been rescinded.[5]

We must now determine whether section 25150.82 imposes a mandatory duty on the Department to rescind Schnitzer's (f) letter and regulate its treated metal-shredder waste as hazardous under the HCWL.

## DISCUSSION

A writ of mandate may be issued to compel a public entity to perform a legal, and typically ministerial, duty when "the petitioner has no plain, speedy and adequate alternative remedy" and "the petitioner has a clear, present and beneficial—or in this case statutory—right to performance." (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 373.) The writ is "the appropriate means by which to challenge a government official's refusal to implement a duly enacted legislative measure." (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 58.) Whether a statute imposes a mandatory duty is a question of statutory interpretation. (*Pacific Merchant Shipping Assn. v. Newsom* (2021) 67 Cal.App.5th 711, 724–725.) Our review is de novo. (*Ibid.*) The issue before us—whether section 25150.82 imposes a mandatory duty on the Department to rescind Schnitzer's (f) letter and regulate its metal-

---

[5] On our own motion, we take judicial notice of a post-judgment enforcement order the trial court entered on April 18, 2022, which was brought to our attention at oral argument. In this order, the trial court concluded that applying the emergency regulation to Schnitzer's facility "violates the Writ and the underlying duties imposed on [the Department] under Section 25150.82." (Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

14

shredder residue pursuant to the HWCL—requires us to interpret the statute. Familiar principles guide our interpretation. Our " 'task is to ascertain the Legislature's intent and effectuate the law's purpose, giving the statutory language its plain and commonsense meaning. [Citation.] We examine that language in the context of the entire statutory framework to discern its scope and purpose and to harmonize the various parts of the enactment. [Citation.] "If the language is clear, [we] must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, [we] may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] The wider historical circumstances of a law's enactment may also assist in ascertaining legislative intent, supplying context for otherwise ambiguous language.' " (*Cahill Construction Co., Inc. v. Superior Court* (2021) 66 Cal.App.5th 777, 785 (*Cahill Construction*).)

## I.  The Language of the Statute

We start, then, with the language of section 25150.82 and with the salient fact that this statutory provision nowhere expressly directs the Department to rescind the (f) letters. The statute refers to the (f) letters just twice. Both times, it refers to the possibility the Department will rescind the (f) letters but does not mandate that the Department take such action, even if it chooses not to adopt alternative management standards. (§ 25150.82, subds. (j)(3)(A) & (k)(1).)

The first mention of (f) letters is in subdivision (j)(3), the safe-harbor provision. Subdivision (j)(3) states that section 25150.82 "does not limit the disposal or use of treated metal shredder waste as alternative daily cover" (at an appropriate facility and pursuant to a pre-existing authorization) "before

15

the department does either of the following:  [¶] (A) Rescinds, in accordance with applicable law, the conditional nonhazardous waste classifications issued pursuant to subdivision (f) of Section 66260.200 of Title 22 of the California Code of Regulations with regard to treated metal shredder waste. [¶] (B) Completes the adoption of alternative management standards pursuant to this section."  In protecting regulatory conduct occurring "before the department" takes action or adopts alternative management standards under this provision, subdivision (j)(3) presumes that rescinding the (f) letters is an action the Department may take.  (§ 25150.82, subd. (j)(3)(A).)  It does not require the Department to rescind the (f) letters or to adopt alternative management standards.

The second mention of (f) letters in section 25150.82 is in subdivision (k), the timeline provision.  This subdivision begins with language that sounds mandatory, but that makes no reference to (f) letters:  "The department shall complete the analysis described in paragraph (1) of subdivision (c) [i.e., the preliminary and final reports required before the Department may adopt alternative management standards] and subsequent regulatory action before January 1, 2018."  (§ 25150.82, subd. (k).)  The subdivision then continues with language describing a regulatory state of affairs the Athletics apparently hope to achieve through this litigation:  "All hazardous waste classifications and policies, procedures, or guidance issued by the department before January 1, 2014, governing or related to the generation, treatment, and management of metal shredder waste or treated metal shredder waste *shall be inoperative and have no further effect* on January 1, 2018 . . . ."  (§ 25150.82, subd. (k), italics added.)  But this sentence continues, specifying that this state of affairs occurs ". . . *if* the department completes its analysis pursuant to subdivision (c) and *takes one*

16

*of the following actions*:  [¶] (1) Rescinds the conditional nonhazardous waste classifications issued pursuant to subdivision (f) of Section 66260.200 of Title 22 of the California Code of Regulations with regard to that waste.  [¶] (2) Adopts alternative management standards pursuant to this section." (§ 25150.82, subd. (k), italics added.)  The language of this long sentence is conditional.  It provides that classifications and policies from the 1980s— including the (f) letters and OPP 88-6—will "be inoperative . . . if" the Department rescinds the (f) letters or adopts alternative management standards.  It does not require the Department to choose one of these regulatory options.

The Athletics' primary response to this argument is to look elsewhere for an "unambiguous command" that the Department rescind the (f) letters. The Athletics locate this mandatory duty, as did the trial court, in subdivision (j)(1) of section 25150.82.  Subdivision (j)(1) states, in full:  "The disposal of treated metal shredder waste shall be regulated pursuant to this chapter and the regulations adopted pursuant to this chapter, unless alternative management standards are adopted by the department pursuant to this section."  Since all parties agree that the Department did not adopt alternative management standards pursuant to section 25150.82 and that "this chapter" is the HWCL, the crucial interpretive question becomes, what does it mean for treated metal-shredder waste to "be regulated pursuant to [the HWCL] and the regulations adopted pursuant to" the HWCL?  The Athletics blow past this all-important question.  Instead, they assume that in order to apply the HWCL to treated metal-shredder waste, the Department must rescind the (f) letters because the (f) letters are "an exemption from the HWCL."

17

We disagree. The (f) letters are a tool specifically provided for in the HWCL and its regulations. As the language of section 25150.82 expressly acknowledges both times it refers to the (f) letters, these are "conditional nonhazardous waste classifications *issued pursuant to subdivision (f) of section 66260.200* of Title 22 of the California Code of Regulations." (§ 25150.82, subds. (j)(3)(A) & (k)(1), italics added.) Regulations section 66260.200 was itself adopted pursuant to the HWCL. (See Regs., § 66260.200 [citing Health & Saf. Code, §§ 25141 & 25150 as authority].)

Far from being "an exemption from the HWCL," the (f) letters are a creation of the HWCL. They document the Department's decision that it is appropriate, *under the HWCL*, "to classify and manage as nonhazardous a waste which would otherwise be a non-RCRA hazardous waste" but which has "mitigating physical or chemical characteristics" shown to "render it insignificant as a hazard to human health and safety, livestock and wildlife." (Regs., § 66260.200, subd. (f).) The Department decided this classification was appropriate when it issued Schnitzer's (f) letters in the 1980s, and it reaffirmed that decision in the January 2018 draft report, where it concluded that classifying treated metal shredder waste "as a hazardous waste is not necessary to prevent or mitigate potential hazards to human health or safety or to the environment."

Properly understood, subdivision (j)(1) of section 25150.82 sets forth the unremarkable requirement that if the Department does not timely adopt alternative management standards, it must enforce the HWCL and its regulations. The Athletics do not contend that subsection (f) of regulations section 66260.200 is no longer in effect. And they do not contend that the particular (f) letters issued to Schnitzer are invalid as inconsistent with the requirements of regulations section 66260.200. Thus, they give us no reason

18

to conclude that for the Department to "regulate[] pursuant to this chapter and the regulations adopted pursuant to this chapter"—as subdivision (j)(1) of section 25150.82 commands—means the Department must rescind Schnitzer's (f) letters, issued pursuant to those very regulations.

That section 25150.82, subdivision (j)(1) is unremarkable does not mean it is surplusage. The Department's January 2018 draft report set forth in considerable detail how practices at metal-shredding facilities were falling short of the requirements of the HWCL, and the petition recounts harms specific to Schnitzer's activities in West Oakland. The Department long acknowledged that OPP 88-6, governing the on-site activities of metal shredders, was contrary to law. The legislative directive in subdivision (j)(1) to enforce the HWCL and its regulations with regard to the disposal of treated metal-shredder waste may similarly require the Department to engage in regulatory action of some sort to ensure strict compliance with the HWCL. But neither the January 2018 draft report nor the allegations in the petition support that the (f) letters themselves are inconsistent with the HWCL or its regulations. We therefore conclude that the requirement of subdivision (j)(1) that the Department regulate treated metal-shredder waste pursuant to the HWCL and its regulations does not support the trial court's finding of a mandatory duty to rescind the (f) letters.

The Athletics offer two subsidiary arguments based on the language of the statute, neither of which need detain us long. They point to section 25150.82, subdivision (k)'s requirement that the Department complete its report and "subsequent regulatory action before January 1, 2018," arguing that if this language is to mean anything it must require that the Department "implement[] one of the two regulatory options the Legislature provided for in subdivision (j)(1)—either applying the HWCL to metal

19

shredder waste or promulgating acceptable alternative management standards"— by the statutory deadline. In making this argument, the Athletics once again conflate "applying the HWCL to metal shredder waste," which the statute requires, with rescinding the (f) letters, which the statute does not require. Schnitzer, for its part, contends that the only "subsequent regulatory action" subdivision (k) requires before January 1, 2018, is the adoption of alternative management standards *if* the Department elects to pursue them. Schnitzer's view may be too narrow. The Legislature may have intended that if the Department opts not to adopt alternative management standards, it must complete all regulatory action necessary to bring the metal shredders into compliance with the HWCL and its regulations by January 1, 2018.

We need not here decide on the precise meaning of "subsequent regulatory action" because the only regulatory action at issue in this proceeding is the proposed rescission of the (f) letters. The Athletics' petition seeks to compel the Department "to require Schnitzer to operate [its facility] in compliance with the HWCL," and the writ includes similarly broad language, but the Athletics have not urged any *specific* regulatory action other than rescinding the (f) letters. We have already rejected the Athletics' contention that for the Department to enforce the HWCL and its regulations means it must rescind the (f) letters. We now accordingly reject the contention that section 25150.82, subdivision (k)'s deadline for "regulatory action" is a deadline for rescinding the (f) letters, in the absence of alternative mandatory standards.

The Athletics also attempt to rely on language in the statute that they contend sets the HWCL as the minimum standard for regulating metal-shredder waste. Specifically, they point to language in section 25150.82,

subdivision (c) allowing the Department to adopt alternative management standards only if these are at least as protective of human health and the environment as is the HWCL, and to language in subdivision (i) allowing alternative management standards to classify treated metal-shredder waste as nonhazardous only if the Department determines that classifying the waste as hazardous is unnecessary to protect human health and the environment. Again, the Athletics' argument lands without force. As to subdivision (c), the statutory requirement setting the HWCL as the minimum standard, below which alternative management standards may not fall, does not mean the (f) letters promulgated under the HWCL are flawed. It simply means that if the Department had adopted alternative management standards, these would have had to regulate metal-shredder waste at least as stringently as did the HWCL and its regulations, *including* Regulations section 66260.200, subdivision (f). As to section 25150.82, subdivision (i), the draft report of January 2018 expressly concludes, classifying treated metal shredder waste "as a hazardous waste is not necessary to prevent or mitigate potential hazards to human health or safety or to the environment." Although the Athletics choose to ignore it, this fact explains why compliance with the HWCL did not require the Department to rescind the (f) letters. Science supported the Department's decision to continue classifying treated metal-shredder waste as nonhazardous.

In sum, we conclude that the language of section 25150.82 requires the Department to enforce the HWCL against the metal shredders but does not require the Department to rescind (f) letters that were issued pursuant to HWCL regulations. Because we consider the statutory language unambiguous on this point, our task is almost finished. We look further only to ascertain whether our literal interpretation of section 25150.82

21

" ' "result[s] in absurd consequences the Legislature did not intend." ' "
(*Cahill Construction*, *supra*, 66 Cal.App.5th at p. 785.)

## II.    Other Considerations

The Athletics contend such construction of the statute is unreasonable because it allows the Department once again to avoid taking action, rendering the statute's January 1, 2018 deadline meaningless.  We disagree and conclude there is nothing absurd about the consequences of our statutory construction.

At the outset, we agree with the Athletics that the Legislature intended section 25150.82 to prompt action from the Department, after it had delayed for years in dealing with environmental problems at the metal-shredding facilities.  In explaining the need for Senate Bill No. 1249, the author stated that the Department had acknowledged its " 'hazardous waste exemptions . . . dating back to the 1980s . . . were "outdated and legally incorrect."  But [the Department hadn't] followed through with the proper action.' "  (Assem. Floor Analysis, 3d reading of Sen. Bill No. 1249 (2013–2014 Reg. Sess.) as amended Aug. 22, 2014.)  The author concluded, " 'this bill requires them to take action.' "  (*Ibid.*)

Senate Bill No. 1249 and the new section it adds to the HWCL do indeed require the Department to take action.  Specifically, the new section requires the Department to complete a detailed analysis of metal-shredding facilities' hazardous waste management activities and take any "subsequent regulatory action before January 1, 2018."  (§ 25150.82, subd. (k).)  The new section also requires the Department to regulate the disposal of treated metal-shredder waste under the HWCL and associated regulations, unless it adopts alternative management standards.  (§ 25150.82, subd. (j)(1).)

There is nothing absurd about a construction of the statute that requires these, but only these, actions; the required acts compel the Department to address the problems that gave rise to Senate Bill No. 1249. The Department must promptly study the hazardous waste problems associated with metal shredding, so that adequate information informs its regulatory actions, and then must bring the activities of the metal shredders into full compliance with the HWCL. Our construction of the statute requires the Department to abandon what was " ' "outdated and legally incorrect" ' " about its exemptions from the 1980s—namely that OPP 88-6 allowed metal-shredding facilities to treat untreated hazardous waste as nonhazardous simply by acquiring an (f) letter. Our construction does not require the Department to rescind the HWCL-compliant (f) letters themselves. Given the science, this result is hardly absurd. The Department's technical analysis concluded that classifying and managing treated metal-shredder waste as hazardous "is not necessary to prevent or mitigate potential hazards to human health or safety or to the environment."

We turn, finally, to the legislative history of section 25150.82, but only to make three points. First, although the Athletics and the trial court rely on legislative history to support their construction of the statute, there turns out to be no role for legislative history in answering the question before us. Because the language of the statute, read as a whole, clearly does not impose a mandatory duty on the Department to rescind all (f) letters, and because the consequences of construing the statute in this manner are far from absurd, we need not consult extrinsic aids. (*Cahill Construction*, *supra*, 66 Cal.App.5th at p. 785.) As is often the case, the plain language of the statute is our surest guide to legislative intent. (See *Jackpot Harvesting Co., Inc. v.*

*Superior Court* (2018) 26 Cal.App.5th 125, 140–141; *Goldstein v. Ralphs Grocery Co.* (2004) 122 Cal.App.4th 229, 233.)

Second, although there is one important indicator of legislative intent that at first glance favors the Athletics' statutory construction, even that statement can be reconciled with our reading of the statute's operative language. As the trial court noted, an uncodified provision of Senate Bill No. 1249 states: "It is the intent of the Legislature that the conditional nonhazardous waste classifications, as documented through the historical 'f letters,' be revoked and that metal shredding facilities be thoroughly evaluated and regulated to ensure adequate protection of the human health and the environment." (Stats. 2014, ch. 756, § 1(f).) The operative provisions of Senate Bill No. 1249, as we construe them, clearly require the thorough evaluation and regulation of metal-shredding facilities that the Legislature intended. The new statutory provision requires the Department to conduct a rigorous analysis and then adopt alternative management standards or enforce the HWCL against the metal shredders. (§ 25150.82, subds. (j)(1) & (k).)

The statute is less categorical or direct in causing the revocation of "conditional nonhazardous waste classifications, as documented through the historical 'f letters.' " The statute requires that in those instances where an (f) letter is inconsistent with HWCL regulations—for example because it was based on technical analyses that no longer support classifying the waste as nonhazardous—the Department must revoke the (f) letter. (§ 25150.82, subd. (j)(1).) The statute also requires the Department to undertake the study that, once performed, led the Department to conclude it should replace the (f) letters with a regulation that would apply to all metal shredders. (§ 25150.82, subd. (k).) The operative provisions of the statute do, as a result,

24

accomplish the Legislature's stated intent in full, if we read the portion that mentions (f) letters as aspirational rather than prescriptive.  As this language is an uncodified statement of intent rather than an operative provision of the statute, we see no reason not to read it in this manner.  (See, e.g., *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925 [" 'statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure,' " though they may serve " 'as an aid in construing a statute' "].)

The third point worth mentioning about the legislative history is that aspects of it counsel against construing the statute to require automatic rescission of the (f) letters.  In particular, as Senate Bill No. 1249 progressed through the legislative process the Legislature amended the bill to *remove* language that would have nullified the historic (f) letters after the deadline passed for adopting alternative management standards.  The provision the Legislature deleted declared that all relevant "hazardous waste determinations and policies, procedures, or guidance issued by the department before January 1, 2014 . . . are inoperative and have no further effect," as of the deadline for adopting alternative management standards. (See Sen. Bill No. 1249 (2013–2014 Reg. Sess.) as amended Apr. 22, 2014, § 1, proposed § 25150.9, subds. (c), (j) & (k).)

Instead, the Legislature opted for a less categorical approach.  In place of the omitted provision it added one that swept away the old rules only under certain conditions, namely ". . . if the department completes its analysis" and either rescinds the (f) letters or adopts alternative management standards.  (§ 25150.82, subd. (k).)  As a result, what would have occurred automatically under the discarded provision now occurs, in the version that became law, only *if* the Department takes a regulatory action that it later

25

declined to take.  The fact that the Legislature made this change to the language of the bill during the political process has implications for a proper construction of the statute.  When the Legislature rejects a provision in draft legislation, that " 'is most persuasive to the conclusion that the act should not be construed to include the omitted provision.' " (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 319; see also *People v. Superior Court* (*Alexander C.*) (2019) 34 Cal.App.5th 994, 1004.)  Since the Legislature chose *not* to render the (f) letters "inoperative" and of "no further effect" after the deadline for adopting alternative management standards, we decline to construe the statute as accomplishing that very result.  (Sen. Bill No. 1249, *supra*, § 1, proposed § 25150.9, subds. (c), (j) & (k).)

These additional observations serve to confirm the conclusion we reach based on a careful reading of the language of section 25150.82.  Although the statute requires the Department to take steps to address hazardous waste problems at the metal-shredding facilities, the statute does not impose a mandatory duty on the Department to rescind all historical (f) letters.  Consistent with section 25150.82, the Department could continue to regulate treated metal-shredder waste through HWCL-compliant (f) letters, since its analysis confirmed this waste need not be classified as hazardous to protect human health and the environment.

## DISPOSITION

The judgment is reversed.  Schnitzer is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*The Athletics Investment Group, LLC v. California Department of Toxic Substances Control et al* (A162524)

27

Trial Court:        Alameda County Superior Court

Trial Judge:        Hon. Paul D. Herbert

Counsel:            Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk,
                    Margaret Rosegay, Stacey C. Wright, Mark E. Elliott
                    and Kevin Murray Fong for Real Party in Interest and
                    Appellant

                    Glynn, Finley, Morti, Hanlon & Friedenberg, Andrew T.
                    Morti and James M. Hanlon, Jr., for SA Recycling, LLC,
                    as Amicus Curiae on behalf of Real Party in Interest and
                    Appellant

                    Keker, Van Nest & Peters, R. James Slaughter, Eric H.
                    MacMichael; Venable, William M. Sloan and Tyler G.
                    Welti for Plaintiff and Respondent

                    Lauren P. Phillips and Jaclyn H. Prange for Communities
                    for a Better Environment, the Center on Race, Poverty
                    & the Environment, San Francisco Baykeeper, the
                    Sierra Club and the Natural Resources Defense Council
                    as Amici Curiae on behalf of Plaintiff and Respondent

                    Rob Bonta, Attorney General, Dennis L. Beck, Jr., and
                    Elizabeth B. Rumsey, Deputy Attorneys General, for
                    Defendants